# IN THE COURT

### FOR THE

# CORRECTION OF ERRORS.

WARNER & RAY *vs.* BEERS, President of the North American Trust and Banking Company.

BOLANDER *vs.* STEVENS, President of the Bank of Commerce in New-York.*

The act entitled " An act to authorize the business of banking," passed 18th April, 1838, was constitutionally passed, although it may not have received the assent of two-thirds of the members elected to each branch of the legislature—and is a valid act.

Associations organized under the General Banking Law and in conformity with its provisions, are not *bodies politic and corporate* within the spirit and meaning of the constitution.

IN the first above entitled cause, the declaration commenced in the name of " Joseph D. Beers," described as " President of the North American

---

* These causes were argued in *February*, 1840, and decided in the month of *April* following. Opinions were delivered by THE PRESIDENT of the Senate, THE CHANCELLOR. and *Senators* ROOT and VERPLANCK : of which the following is a brief analysis :

PRESIDENT of the Senate. Corporations exist either by *express grant* or *by implication*. By the General Banking Law *corporations* are not *expressly* created or authorized; and the associations formed under that law are not corporations *by implication*. An association of men will not be deemed *a corporation by implication*, except where corporate authority is *necessary* to the exercise of beneficial powers expressly granted, or for the protection of important interests, or the execution of important trusts ; nor will such association be deemed to possess corporate powers, unless such powers were solicited by the donees of the powers ; are conformable to the clear indicated intent of the donors ; and above all, such association will not be adjudged to possess corporate powers, if the effect of so holding will be the destruction of powers otherwise undeniably existing.

These associations are not corporations by implication, because, 1. There is *no necessity* they should possess corporate powers to carry into effect the object for which they are authorized ; 2. Such powers were not solicited by the public in their appeals, to the legislature for the law which was passed ; and 3. The legislature did not intend to create or authorize corporations, nor have they done so by conferring the powers and privileges which these associations are authorized to use and enjoy. Even at common law, most of these powers and privileges were claimed, and had long been exercised by private associations, copartnership and joint stock companies ; and as to powers ordinarily incident to corporations, they have frequently been conferred upon private associations, and yet have not been held to have the effect *per se* to create corporations.

If these associations be deemed *corporations*, the law authorizing them not being within the

Albany, April, 1840.—Warner v. Beers.

Trust and Banking Company, an association doing business in the city of New-York, *under and by virtue of an act of the legis-    [ *104 ] lature of the state of New-York, entitled ' an act to authorize the business of banking,' passed April 18th, 1838, who prosecutes for and on

*mischief* intended to be remedied, is not within the inhibitory clause of the constitution. The evil intended to be guarded against, was the *exclusive character* and undue multiplication of corporations possessing and exercising *banking powers*, which by means of the *restraining act* had grown into *monopolies*. The effect of the General Banking Law is to repeal *pro tanto* the restraining act, and thus restore to the citizens generally a common right of which they had long been deprived. The General Banking Law, instead of violating, comes directly in aid of the provision of the constitution, and is therefore a constitutional act, although it did not receive the assent of two-thirds of the members elected to each branch of the legislature.

The *certificate* of the secretary of state as to the time of the passage of a bill by the two houses of the legislature is *conclusive evidence* that such bill has been passed in due form, except as to bills referred to in the ninth section of the seventh article of the constitution of the state. In respect to such latter bills inquiry may be made, as to the number of votes given on their passage; but such inquiry cannot be by a *jury*, it must be by the *court*, by an inspection of the record in the secretary's office.

The CHANCELLOR. The *constitution* of the state, like an act of the legislature, must be construed according to its spirit and intent: taking into view the evil intended to be remedied, and the danger sought to be guarded against.

The constitutional provision requiring the assent of two thirds of the members elected to each branch of the legislature, to every bill *creating, continuing, altering or renewing any body politic or corporate*, was intended to guard against the increase of joint stock corporations, either for banking or any other purposes of trade or profit, the charters of which conferred *exclusive privileges*, and which, when obtained, were beyond the reach of general legislation so that they could neither be modified or repealed. The provision was not intended to restrict the power of the legislature so as to prevent the granting of *an equal right or privilege to all the inhabitants of the state*, or as many of them as chose to associate together, for purposes of trade or other lawful business, during the continuance of the act granting the privilege, provided such privilege was at all times subject to the control of general legislation.

The *associations* formed under the *General Banking Law*, having the right in their collective capacities, to *hold property in common*, and *in a manner* in which *individuals* are not permitted to hold, and of *transmitting* the same to others *by an artificial and continued succession*, possess powers which are *distinguishing characteristics of corporations;* and had the act *guaranteed* the continuance of such associations, so that the powers, privileges, and immunities conferred, could not be taken away by a *simple repeal of the law*, or modification of it by *general legislation*, the act would have been within the prohibitory clause of the constitution, and invalid unless passed with the assent of *two-thirds* of the members elected to each branch of the legislature.

An act of the legislature, *authorizing an indefinite number of corporations*, to be created, upon compliance with certain prescribed conditions, is a valid and constitutional act, if passed with the assent of two-thirds of the members elected to each branch of the legislature.

Upon demurrer to a declaration in a suit by an association formed under the general banking law, the court will not look beyond the statute book to ascertain whether the act was passed by a two-thirds vote, or by a mere majority.

Whether a court is authorized in any way to institute an inquiry *into the mode in which a law was passed*, where the act of the legislature has received the signature of the governor, and been duly certified by the secretary of state, *quere*.

If the associations formed under the general banking law be viewed as mere *copartnerships*, it is competent to the legislature by a mere majority bill to authorize suits by them in the

VOL. XXIII.                11

Albany, April, 1840.—Warner v. Beers.

behalf of the said association ;" and then was set forth in the usual form a count on a promissory note by the third endorsee against War-

[ *105 ]   ner and Ray as endorsers.   The declaration *also contained the common money counts, and the *insimul computassent,* alleging the debts to have arisen, and the promises to have been made to " *the said association,*" and concluded with the words " to the damage of the said association of five hundred dollars ; and therefore the said plaintiff as president as aforesaid, brings suit, &c."

[ *106 ]   *The declaration in the second suit was like the preceding, except that it contained only the common money counts, and the

names of their officers.   The grant of an incident of a corporation does not necessarily create a corporation.

Although some of the powers conferred upon the associations authorized by the act, are of a character to constitute them *bodies politic and corporate,* yet as such powers can endure only whilst the act remains in force, and as it may be modified or repealed by the legislature by a vote of less than two-thirds, the General Banking Law is not within the spirit or intent of the restrictive clause of the constitution.

*Senator* ROOT.   The *associations* formed under the *General Banking Law* are *corporations,* and the act not having received the assent of *two-thirds* of the members elected to each branch of the legislature, is unconstitutional and void.

Even had it received the assent of two-thirds of the members of the legislature, it would still have been void.   The constitution requires such assent to the creation of *each* and *every* body politic or corporate ; an indefinite number of corporations cannot be authorized or created under a *general act* of the legislature.

*Senator* VERPLANCK.   The associations formed under the General Banking Law are *not bodies politic and corporate.*   The powers conferred upon them in respect to the *transferability of shares,* the *limited responsibility* of the shareholders, the *non dissolution* of the association by the death of a member, and the *prosecution of suits* by and against the president of the association, although ordinarily accompanying corporate privileges, especially in respect to moneyed institutions, do not in themselves confer a corporate character; they may be and frequently are used and enjoyed by *unincorporated* associations or partnerships.

The associations authorized by the General Banking Law, are PARTNERSHIPS or JOINT STOCK COMPANIES, relieved from the inhibition of the " Act to restrain unincorporated companies" from banking, and may carry on the business of banking, on compliance with certain specified requirements.

The General Banking Law is not a violation of the provisions of the constitution forbidding the creation of *bodies politic and corporate,* unless with the assent of *two-thirds* of the members elected to each branch of the legislature; the provision referred to was intended to guard against the undue increase of institutions enjoying *exclusive privileges,* and operating as *monopolies.*   The act in question, instead of conflicting with the constitutional inhibition, comes directly in its aid by opening the business of banking to *all* who choose to engage in it, upon compliance with the requirements of the legislature.

The doctrine of Lord *Coke,* " that against a general act of parliament, or such an act whereof the judges ought *ex officio* to take notice, *nul tiel record* cannot be pleaded," applies to an act of our legislature.   It is the duty of courts, without the intervention of a jury, to inform themselves as to the legal existence of a statute in the best way they can : by reference to the journals of the legislature, by adverting to uncontradicted cotemporaneous public history, and by an inspection of the statute in manuscript deposited in the secretary's office.

Albany, April, 1840.—Warner v. Beers.

count on the *insimul computassent.* To these declarations, demurrers were put in by the defendants respectively. In the first suit, the following causes of demurrer were assigned, viz :

*I. It is not shown by the declaration, that the plaintiff Joseph    [ *107 ] D. Beers, had any cause of action whatever against the defend-ants; on the contrary, all the causes of action therein stated are shown to exist in favor of the association called " The North American Trust and Banking Company," or the individuals composing that Association.

II. No authority exists in law for the plaintiff to sue the defendants for or in behalf of The North American Trust and Banking Company, or upon promises made or causes of action accruing to the said company. The suit should have been brought in the name of the company.

III. If the institutions authorized by the act in the declaration mention-ed, entitled " An act to authorize the business of banking," are mere asso-ciations or special partnerships of individuals, and are not corporations, then the declaration is defective, because it does not state the persons to whom the several alleged promises therein mentioned, were made.

IV. By the laws of this state, no association of persons not incorporated, nor any combination or partnership, are entitled to maintain suits in the name of a president or other officer, or in the name of their firm or association, or in any manner, except in their baptismal and individual names.

V. The institutions or associations authorized and intended to be created by the act entitled " An act to authorize the business of banking," are cor-porations or bodies politic, and the act expressly allows the creation of an in-definite and unlimited number of such corporations, at the pleasure of any persons who may associate for that purpose. The act is therefore a viola-tion of the ninth section of the seventh article of the constitution of this state, and is absolutely void.

The declaration in the second above entitled cause was *in its    [ *108 ] commencement and conclusion similar to the declaration in the first cause. It contained only the common money counts, and an *insimul computassent.* The defendant here also interposed a demurrer assigning special causes, similar to the special causes in the first count; the *fourth* special cause being in these words : " For that the act in the declaration mentioned, entitled ' An act to authorize the business of banking,' so far as the same proposes to authorize this suit, is a violation of the provisions of the constitution of this state, respecting the creations of incorporations, and is void ; and also that the said act is void, because the same did not receive the assent of two-thirds of all the members elected to the legislature of this state, by which legislature the said act purports to have been passed."

The two demurrers were brought to argument before the supreme court, at the January term, 1840, and judgment given in both cases for the plain-

tiffs. The court referred, for the reasons of the judgment, to the opinions delivered by Chief Justice Nelson, Mr. Justice Bronson and Mr. Justice Cowen, in the case of *Thomas* v. *Dakin, 22 Wendell*, 9 *et seq.* Both causes were removed by writs of error to the court for the correction of errors, and were brought on to argument on the 18th February, 1840. The argument was conducted by

*L. Sandford* and *J. A. Spencer*, as counsel for the plaintiffs in error.

*W. C. Noyes* and *S. A. Foot*, as counsel for Joseph D. Beers.

And *W. Kent* and *D. B. Ogden*, as counsel for John A. Stevens.

Mr. *Sandford* submitted the following points on the part of the plaintiffs in error:

I. The act of the legislature of this state, mentioned in the pleadings below, entitled " an act to authorize the business of banking," passed April 18, 1838, authorizes the creation *of an indefinite number of corporations. *Laws of* 1838, *ch.* 260, 245. *Angell & Ames on Corp.* 27, 37, 38, 39, 41. 1 *Black. Comm.* 472, also 467, 468, 475. 2 *Kent's Comm.* 276, 3d ed., also 267, 277, 278. 2 *R. S.* 581, § 28. *Co. Litt.* 250. *Viner's Abr. Corp. G.* 8. *Angell & Ames on Corp.* 1, 58, 59. 1 *Kyd on Corp.* 13, 69, 70. *Jenkins' Cent. Ca.* 270. *Dartmouth College* v. *Woodward, per Marshall, Ch. J.* 4 *Wheat. R.* 636. 1 *R. S.* 600, § 1, 2, 3, 4. *The People* v. *Throop,* 12 *Wendell,* 183. As to succession by name: *Angell & Ames on Corp.* 23, 24; *The case of Sutton's Hospital,* 10 *Rep.* 1, 33, *b.,* *Jenkins' Cent. Cas.* 270, *case* 88, *S. C.; College of Physicians* v. *Salmon,* 3 *Salk.* 102; 1 *id.* 191, *S. C.; Ld. Raym.* 681; *Viner's Abr. Corp. E.* 7; 3 *R. S.* 288. 292, 304, *1st ed.; Josephs* v. *Pebrer,* 3 *Barn. & Cress.* 689; 5 *Dowl. & Ryl.* 542, *S. C.*; 1 *Carr. & Payne,* 507; *Duvergier* v. *Pellows,* 5 *Bing.* 248; 5 *Maule & Sel.* 403, *S. C.; Collyer on Part.* 620 *to* 625. 2. As to suing and being sued as a *collective existence by a given name:* 1 *Roll. Abr.* 515; *College of Physicians* v. *Butler, W. Jones' R.* 262; *Harvey* v. *Kay,* 9 *Barn. & Cress.* 356; *Wordsworth's Law of Joint Stock Companies,* 50, 155, 160, 161, 163, *and App.* 17, 24, 46, 148; *Act* 7, *Geo.* 4, *ch.* 46; 4 *and* 5 *Wm.* 4, *ch.* 94, § 1; *Armitage* v. *Hamer,* 3 *Barn. & Ald.; Bartlett* v. *Pentland,* 1 *id.* 704; *Davis* v. *Fisk, Wordsworth, App.* 189, 192; *Farren on Life Assurance,* 128; *Viner's Abr. Corp. E.* 4; 1 *Kyd on Corp.* 21; *College of Physicians* v. *Salmon,* 3 *Salk.* 102; *Anon. id.* 3. As to the power to take and grant, &c. as collective existence by its proper name: 10 *Rep.* 31, *b.*; 1 *Black. Comm.* 123; *Words-*

*worth on Joint Stock Companies*, 163 *to* 170 ; *Fox* v. *Hanbury, Cowp.* 449 ; *Ex parte Hamper*, 17 *Ves.* 407 ; *Parker* v. *Pistor*, 3 *Bos. & Pul.* 288 ; *Chapman* v. *Koops, id.* 289. 4. In reference to English joint stock banks : *Wordsworth on Joint Stock Companies*, 3, 4, 35, 109, 163 *to* 170, *and the statutes cited in App.* ; *Kearsley* v. *Codd*, 2 *Car. & Payne*, 408, *n.* ; *Mandsly* v. *Le Blanc, id.* 409, *n.* ; 6 *Bing.* 776 ; *Fox* v. *Clifton*, 9 *id.* 120 ; 4 *Moore & Payne*, 676, *S. C. Nockles* v. *Crosby*, 3 *Barn. & Cress.* 814 ; *Angell & Ames on Corp.* 23, *349, and    [ *110 ] *cases cited ; Neale* v. *Turton*, 12 *Moore*, 365 ; 4 *Bing.* 149, *S. C.; Perrin* v. *Hone*, 12 *id.* 135 ; 4 *id.* 28, *S. C.; Goddard* v. *Hodges*, 3 *Tyr.* 209 ; 1 *Cromp. & Meeson*, 33, *S. C.* 5. As to the intention of the legislature : 2 *Jac. Law Dict. Corp.* 1, 94 ; 2 *Kent's Comm.* 276 ; *Angell & Ames*, 45 ; *Dyer's R.* 100, *pl.* 70 ; *Lane's R.* 21 ; *Viner's Abr. Corp. G.* 8. *Denton* v. *Jackson*, 2 *Johns. Ch. R.* 320, 324; *Inhabitants of 4th School District* v. *Wood*, 13 *Mass. R.* 192 ; 1 *Roll. Abr.* 513, 515 ; *Com. Dig. Franchises, F.* 6 ; *North Hempstead* v. *Hempstead*, 2 *Wendell*, 133; *Sutton's Hospital*, 10 *Rep.* 23, 28, 30 ; *Laws of* 1838, *p.* 228, 230 ; *per Ch. J. Marshall*, 2 *Cranch*, 358, 386 ; *Heydon's case*, 3 *Rep.* 7.

II. By the ninth section of the seventh article of the constitution of this state, the legislature is prohibited from passing any law for the creation of an indefinite number of corporations. The act in question is therefore unconstitutional and void. 1 *R. S.* 45. *People* v. *Morris*, 13 *Wendell*, 325, 336, 338. *N. Y. State Convention Debates, &c.* 446. *Wood* v. *Jefferson Co. Bank*, 9 *Cowen*, 194. *Sutton's Hospital*, 10 *Rep.* 33. *Jenkins' Cent. Ca.* 270. 1 *Black. Comm.* 474. *Dwar. on Stat.* 693. *Senate Doc. of* 1835, *No.* 4. *Assembly Doc. of* 1837, *Nos.* 303, 304.

III. The general banking law did not receive the assent of two thirds of all the members elected to each house of the legislature, which defect appears by the law itself. It is therefore unconstitutional and void. 4 *Inst.* 25, 35. 8 *Reports*, 20 *b.* 27, 55 40, *The Prince's case, Com. Dig. Parliament R.* 3 & *G.* 10, 22. *Co. Litt.* 98 *b.* *Hobart*, 110. 1 *Dwarris on Stat.* 246, 247. 18 *Stat. at large*, 9. 33 *Geo.* 3d, *ch.* 13. *Constitution, Art.* 1, § 12. *Art.* 7, § 9. 1 *Rev. Stat.* 156-7, § 2 *to* § 13, 166, § 4 *to* 6, 183-4, § 6, 8, 10, and 12. *Dwar. on Stat.* 630, 631. 3 *vol. Co. Litt. note* 107 *by Harg. & Butler, to* 98 *b.* 1 *Hale's Hist. of the Common Law*, 19, 20, 25. *Bac. Abr. Statute, L.* 1. 1 *Starkie's Ev.* 161-2, *and note.* 1 *Phill. Ev. by Cowen & Hill*, 316, 317, 383. *Gilb. Law of Ev.* 8, *S. P. Laws* 1811, *ch.* 246, § 46. 1 *Rev. Laws*, 527. *Dyer*, 93, *Duke of Norfolk's case.* *Hobart's R.* 109, *The King* v. *Lord Howard ; S. C. in Moor's *Cases*, 824, *pl.* 1112. 4 *H.* 7, 18. 33    [ *111 ] *Hen.* 6, 17. 1 *Strange*, 446, *Rex* v. *Jeffries.* 3 *Burr.* 1472.

*Rex* v. *Robotham. Plowd. Com.* 79 *a. Hatt. Parl.* 32. *Vin. Abr. Stat. A.* 1. 16 *Howell's St. Tr.* 1388, 1390, *Earl of Macclesfield's case.* 2 *Rev. Stat.* 409, § 4. 6 *Wendell,* 512. *Trotter* v. *Mills.* As to plea of *nul tiel corporation :* 2 *Rev. Stat.* 458, § 3, 13; *Reviser's notes,* 3 ibid. 754, 2d ed. 9 *Cowen,* 194.

IV. The defendant in error having brought his suit below under the unconstitutional provisions of this law, was not entitled to recover. *Wordsworth on Joint Stock Companies,* 161, 162. *Farren on Life Assurance,* 31. *Soulby* v. *Smith, Treasurer of the W. I. Dock Company,* 3 *Barn. & Ald.* 929.

V. If the North American Trust and Banking Company, formed under the provisions of this act, *is not a corporation,* then the declaration is defective in not fully describing the persons to whom the debt claimed in the declaration is due. It should have stated the names of the persons composing the association, and alleged the indebtedness to be to them by name. *Wordsworth,* 163. *Opinion of Cowen, Justice in this case, in court below.*

Mr. *Spencer,* on the same side, submitted the following points :

*First.* This court ought to, and will, as the supreme court should have done, take judicial notice without plea by what majority the " act to authorize the business of banking" was passed. 1. Because *facts* only, and not the *law,* are the proper subjects of pleading : 1 *Chit. Pl.* 271 ; 5 *East,* 275 ; *Com. Dig. Pleader, C.* 278. 2. Because every person is presumed to know the law ; and certainly our highest judicial tribunals are not, and will not confess themselves ignorant of it ; 4 *Bl. Com.* 27 ; 2 *Kent Com.* 491. 3. But if this matter of the majority be a question of fact, or a mixed question of law and fact, then the legislature has declared what shall be the evidence, and the only evidence by which such majority shall be manifested. 1 *R. S.* 143, (157) § 3 : " No bill shall be deemed to have been passed by the assent of two thirds of the members elected to each house, unless so [ *112 ] certified by the presiding officer of each house." This *enactment casts the *onus probandi* upon the defendant in error. Before he can claim the benefit of such majority, he must show it affirmatively. 4. The copy of the act having been published in the session laws by the printer to the state without the certificates of the manner of its passage, which appear on the act in the office of the secretary of state, furnishes no reason for the courts indulging presumptions against the truth, or omitting to look into the original act in the office, or shutting their eyes against its publication in the state paper, or for professing ignorance of what they are presumed to know, and do in fact know.

Suppose the laws were now published, as they were in former years, with the certificates of the president of the senate and speaker of the assembly,

and approval of the governor, could the supreme court or this court presume against such evidence ? The statute before cited forbids any such presump. tion of a two thirds vote. The publication of the act in the session laws, therefore, only warrants the presumption of a majority vote. But if neces- sary, the original act, or an exemplification thereof, may be read on the ar- gument at bar.

*Second.* It then being well known as matter of law or fact, that this act passed only by a majority vote, and that it is so certified, the main question on the merits is fairly presented by the record, and will be frankly and boldly met by this court, and finally settled.

*Third.* The main question is, that these " associations," if the act were not void, would be corporations in every essential ingredient and particular. But the act is void for the want of the assent of two-thirds of all the mem- bers elected to each branch of the legislature ; and it is void as a whole. No authority therefore exists for the defendant in error to sue in his name upon a promise alleged to be made to others. *See the authorities cited in the opinions of the justices of the supreme court.*

*Fourth.* But the act is void ; because a general law, directly creating, or authorizing the creation of an indefinite number of these associations, (cor- porations,) is inconsistent with the 9th section of the 7th article of the constitution of *this state, which contemplates the separate ac- [ *113 ] tion of the legislature upon " every bill ;" and in accordance with this construction is the eighth joint rule of the legislature. It is humbly sub- mitted, therefore, that the judgment of the supreme court, not for the rea- sons given by it, is erroneous, and ought to be reversed, with costs.

Mr. *Noyes* and Mr. *Foot* submitted the following points on the part of the defendant, *Joseph D. Beers :*

I. An act of the legislature is never to be declared unconstitutional, ex- cept in a clear and plain case, and where there is an entire freedom from doubt. *Ex parte McCollum,* 1 *Cowen,* 564. *Dartmouth College* v. *Woodward,* 4 *Wheat.* 625. *Cooper* v. *Telfair,* 4 *Dall. R.* 14.

II. The 9th section of the 7th article of the constitution of this state, be- ing in restraint of common right, restrictive of the powers of the legislature, and in substance, so far as this question is concerned, in aid of the Restrain- ing Act, is to receive a strict construction ; at all events, it is not to be ex- tended beyond the plain and obvious import of its words. 1 *Story's Com. on Con. U. S.* 382, *ch.* 5, § 400. *Bacon's Abr. Statute, I,* 6, 7, 8, 9. *Vattel, Book II, ch.* 17, § 292, 308, 281, 277. *Ruth. Inst. Book II. ch.* 1. *Dwar. on Statutes,* 749. 1 *Bl. Comm.* 59, 60. *The People* v. *Uti- ca Ins. Co.* 15 *Johns. R.* 358. 1 *Kent's Comm.* 461, 2, 3d ed. *Melody* v. *Reab,* 4 *Mass. R.* 471. *McQueen* v. *Mid. Manuf. Co.,* 16 *Johns. R.* 7. *Dwar. on Statutes,* 729. *King* v. *Hardy,* 6 *T. R.* 286. 6 *B. & C.* 475. 11 *Peters,* 420.

III. In ascertaining the import of the words of the constitution, the intention of its framers is to control in every respect. 1 *Story's Comm. on Con. U. S.* 382, ch. 5, § 400. *Bacon's Abr. Statute,*: *I*, 6, 7, 8, 9. *Vattel, Book II*, ch. 17, § 292, 308, 281, 277. *Ruth. Inst. Book II, ch.* 1. *Dwar. on Statutes*, 749. 1 *Bl. Comm.* 59, 60. *The People* v. *Utica Ins. Co.*, 15 *Johns. R.* 358. 1 *Kent's Comm.* 461, 2, 3d ed. *Melody* v. *Reab*, 4 *Mass. R.* 471. *McQveen* v. *Mid. Manuf. Co.*, 16 *Johns. R.* 7. *Dwar. on Statutes*, 729. *King* v. *Hardy*, 6 *T. R.* 286. 6 *B. & C.* [ *114 ] 475. 2 *Kent's Comm.* 279. 3 *R.* *S.* 292, 1st ed. 288, 394. 1 *R. L.* 1813, 245. *Plowden*, 18. *People* v. *Morris*, 13 *Wendell*, 525. 11 *Peters*, 420.

IV. The associations authorised by the General Banking Laws, *Laws of 1838, p.* 245, even conceding that they are corporations, are not within the section of the constitution referred to. 1st. They are not, within the intention of its framers. 1 *Green. L. N. Y.* 50. 3 *Webster's do.* 615. 1 *R. S.* 721. *Bristol* v. *Barker*, 14 *Johns. R.* 205. *Vanness* v. *Hamilton & al.*, 19 *Johns. R.* 349. *Debates, N. Y. Con.* 1821, *p.* 446. *People* v. *Morris*, 13 *Wendell*, 336. *Vattel, Book III*, ch. 17, § 292. *Bacon's Abr. Statute, I*, 6, *pl.* 49. 2dly. The section was not aimed at general acts of incorporation, and they are not within the evils intended to be remedied. 3dly. The act in no sense *creates* corporations. *Ass. Doc.* 1837, *No.* 303.

V. The section referred to does not prohibit the passage of an act creating or authorising the creation of one or more corporations in one bill. It applies simply to the number of votes required to authorize a corporation. *Senate Doc.* 1835, *No.* 4, *p.* 18. *Jefferson Co. Bank* v. *Wood*, 9 *Cowen*, 194. *Dwar. on Stat.* 693. *Rev. Repr pt.* 1 *ch.* 18, *tit.* 6. *Ass. Doc.* 1832, *p.* 277, *and opinion annexed.* 3 *R. & S. new ed.* 202 *to* 224. *Con. N. Y. art.* 7, § 13.

VI. The act in question is a public act, of which courts *ex officio* take notice ; its validity cannot be put in issue by a plea, nor can it be denied that it was passed by whatever number of votes the constitution required, in order that it might become a law. Whether it is a law or not, is to be determined by the court, upon inspecting the record in the office of the secretary of state. *Con. N. Y. art.* 1, § 2, 3. 3 *id. art.* 9, § 13. *Dwar. on St.* 629, 630, 632, 637. *Id.* 28, 30. *Trotter* v. *Mills*, 6 *Wendell*, 512. *Comyn's Dig. tit. Parliament, R.* 5. *Bac. Abr. Statute L. pl.* 12. *Duke of Norfolk's case, Dyer*, 93, (a). *Id.* 138, *n. King* v. *Arundel, Hob. R.* 109. *The Prince's case*, 8 *Co.* 28. *King* v. *Jeffries*, 1 *Str.* 446. *King* v. *Robotham*, 3 *Burr.* 1472. 1 *R. S.* 156, § 3. *Id.* 157, § 10, 11. *Id.* 166, § 3. *Id.* 184, § 12. *Fletcher* v. *Peck*, 6 *Cranch*, 131.

VII. The associations authorised by the General Banking [ *115 ] Law are not corporations ; they are destitute of some of the essen-

tial attributes of such bodies, and are merely joint stock associations, which have never been considered corporations. *Colly. on Part.* 393. *Clarkson* v. *Carter*, 3 Cowen, 84. *Roardman* v. *Keeler*, 2 Verm. R. 65. *Skinner* v. *Stocks*, 4 Barn. & Ald. 437. 1 Jurist ed. of Rep. by H. & V. 458. *Harrison* v. *Timmins*, id. 160. *Dickinson* v. *Valpy*, 10 Barn. & Cres. 128. *Bramah* v. *Roberts*, 3 Bing. 963. *Connell* v. *Sawyer*, Lond. Jur. 1838, p. 1085. Id. 1837, pp. 967, 969, 970. Id. 617, 625, 723. 2 Kent's Comm. 276, 7. *Conservators of River Tone* v. *Ash*, 10 Barn. & Cres. 349. *Bridgewater Canal Co.* v. *Blewett*, id. 393. *Tilden* v. *Metcalf*, 2 Day, 259. *Denton* v. *Jackson*, 2 Johns. Ch. R. 320. *Hempstead* v. *Hempstead*, Hopk. 288. *Jansen* v. *Ostrander*, 1 Cowen, 670. 2 R. S. 448, § 11. Id. 71, § 17. *Life and Fire Ins. Co.* v. *Mech. Ins. Co.* 7 Wendell, 31. Bac. Abr. stat. G. pl. 6, 8. N. Y. Fire Ins. Co. 768. *Head* v. *Providence Ins. Co.*, 2 Cranch, 127. *Minor* v. *Mechanic's Bank*, 1 Peters, 46. 1 R. S. 599, § 1. 1 Wood. Lec. 471, 493. Viner's Abr. Corporation, A. 2, pl. 1, 2, 9. Kyd on Corp. 226. *Clark* v. *Manuf. Co.* 15 Wend. 256. Colly. on Part. 619 to 624, 656, 652. *Metcalf* v. *Bruin*, 12 East, 400. *Rex.* v. *Biggs*, 3 P. Wms. 423. *Randall* v. *Van Vechten*, 19 Johns. R. 60. *Beverly* v. *Lincoln Gas Light Co.* 6 Adol. & Ellis, 829. *Harper* v. *Charlesworth*, 4 Barn. & Cres. 575 ; 6 Dowl. & Ryl. 589, S. C. 5 Dane's Abr. 144. 1 Kyd. 301. Bacon's Abr. Corp. E. 3. Viner's Abr. Corp. A. pl. 8 ; *Rex* v. *Ld. Dacres*, Dyer, 81, pl. 64, S. C. 1 R. S. 764. 1 Kyd, 10 to 13. 2 Evans' Stat. 221, (252.) Lond. Jur. 1837, pp. 249, 616, 267. Id. 1838, pp. 188, 704, 750.

VIII. The principal effect of the General Banking Law is to repeal so much of the Restraining Act as prohibits associations from carrying on the business of banking, and to allow it to be carried on under such restrictions and limitations as the act imposes. If any part of the act be repugnant to the constitution, it is only void so far as corporate powers are conferred ; every other part remains valid. It *is a law for the regulation of [ *116 ] a particular branch of business clearly within the powers of the legislature ; the associations formed under it are legal, and contracts made with and the collection of debts due to them may be enforced in the manner pointed out, with the same effect as in suits by individuals. *Senate, Doc.* 1837, No. 55. Id. 1838, Nos. 42 and 68. Ass. Doc. 1838, No. 122. Lond. Jur. 1837, p. 9. 2 Cranch, 358. Ram. on Judgt. 233, 4. Dwar. on Stat. 755, 6. *Bristol* v. *Barker*, 14 Johns. 205.

Mr. *Kent* and Mr. *Ogden* submitted the following points on the part of the defendant, *John A. Stevens.*

*Point* 1st. The *association* on behalf of which this suit is brought, and *all associations* authorized by the General Banking Law, are simply *special part-*

*nerships*, under certain statutory restrictions, and they may, or may not, at their option, assume *certain statutory privileges.*

1. The association of persons is a common law right inherent in all persons, for every branch of business not prohibited by positive law; and in respect to these associations, the restraining act has been repealed.

2. These associations are subject to certain *terms and conditions*, such as the *deposit of public stock, filing of certificates, rendering annual reports, keeping a certain amount of specie on hand.* These terms must be complied with, but are merely restrictive of the powers of ordinary partnerships, and have no relation to corporate powers.

3. These associations may assume, if they choose, certain privileges, as the *transferability of shares*, the *right to sue in the name of the president*, the *limited responsibility* of shareholders, *holding land* to a certain extent in the name of the president; but these privileges may not be assumed, and depend on the option of the associations.

4. These privileges are all known to the common law, and virtually enjoyed by all partnerships, viz.

I. *The transferability of shares.* This may be done in all partnerships by special clauses in the articles. *Colly. on Part.* 647. *King v. Webb*, 14 *East*, 406. *Alvord* v. *Smith*, 5 *Pick.* 232. *Fereday* v. *Wightwick, Colly. on Part.* 658.

            *II. The non-dissolution of the association by death of a member.*
[ *117 ] This may be prevented in partnership by agreement *Colly. on Part.* 5, 648. *Pearce* v. *Chamberlain*, 2 *Vesey*, 33. *Kingman* v. *Spurr*, 7 *Pick.* 235. *Wrexham* v. *Huddlestone*, 1 *Swanst.* 514.

III. *Suits by or against the president: one of the partners.* This power exists at common law.

1. In *suits by partners*, on deeds made to a part only, those *only* named in the deed *can* sue. *Metcalf* v. *Rycroft*, 6 *Maule & Sel.* 75. *Colly. on Part.* 388, *and cases there cited. Scott* v. *Goodwin*, 1 *Boss. & Pull.* 67.

2. So in cases of promissory notes given to part only of partners; they only can sue. *Pearce* v. *Hirsh*, 10 *Barn. & Cress.* 122. 1 *Caines* 505.

3. Dormant and normal partners need not join in a suit. *Mitchell* v. *Dale*, 2 *Harr. & Gill.* 171.

4. In suits against one partner, the non-joinder of a partner can never be taken advantage of by any proof on the general issue, and only by a plea in abatement. *Colly. on Part.* 421. The non-joinder of a *dormant partner* cannot be pleaded even in abatement. *Baldwin* v. *Ritchie*, 1 *Stark.* 338. *Ex parte Norfolk*, 19 *Vesey*, 455.

5. The suits brought in *the name of the obligee of a bond*, which has been assigned to others; and all suits by executors and administrators, in *auter droit*, assert with striking analogy, the existence of this power at common law.

6. In England, 54 *Geo.* 3, *ch.* 79, *Wordsworth on Joint Stock Companies*, 161, this right to sue is declared not to create a corporation.

IV. *The limited responsibility of partners.* This also exists at common law, in respect to all persons dealing with notice. 1 *Campbell*, 404. *Bell's Comm.* 105, § 399. 1 *R. S.* 763. Limited responsibility was recognized in France in 1673, as not an essential quality of corporations. On the other hand, many corporations are without the principle of limited responsibility, as manufacturing companies, &c.

V. *The right to hold lands*, is a well known power of partnership, recognized in equity. *Colly. on Part.* 76. *Townsend* v. *Devaynes*, 1 *Mont. on Part. App.* 98. *Coles* v. *Coles*, 15 *Johns.* [ *118 ] R. 159. *Smith* v. *Jackson*, 2 *Edw. Ch. R.* 28. *This equitable right of partners is restricted to the associations ;* and so far as lands may be held at all by the president, the act merely makes him trustee, to a more limited extent than partners are by the common law.

*2d Point.* If the first point is correct, the act authorizing the business of banking is in no respect contrary to the ninth section of the seventh article of the constitution ; but if any of the privileges conferred by the act are contrary to the constitution, the residue of the act remains unaffected and valid.

*3d Point.* The associations authorized by the General Banking Law are *not* corporations, nor, does this act authorize the formation of bodies politic or corporate. *Domat's Civil Law, b.* 1. *tit.* 15. *Black.* 123. 2 *Kyd*, 50. *Rex.* v. *Richardson*, 1 *Burr.* 517. 11 *Coke*, 99, *a.* *Bank of Niagara* v. *Johnson*, 8 *Wendell*, 645. 1 *Ld. Raym.* 498. *Taylor's Civil Law*, 568.

*4th Point.* The ninth section of the seventh article of the constitution is not to be construed as applicable to the general legislation, conferring no exclusive privileges affecting the whole community, and introducing a new and general system of policy. *Slee* v. *Bloom*, 14 *Johns. R.* 456. *Bank of Niagara* v. *Johnson*, 3 *Wendell*, 645.

*4th Point.* The General Banking Law will be held by the court to have been constitutionally passed, in a constitutional way ; and no inquiry can be permitted as to the number of votes by which it passed in either house of the legislature.

After advisement the following opinions were delivered:

By the CHANCELLOR. The declaration in the case of *Beers, President &c.* v. *Warner and Ray*, originally contained some of the common counts ; but as the plaintiff thought proper to enter a remitter of damages upon those counts, and to take his judgment only upon the special count against the defendants as endorsers of the note drawn by R. Hoe & Co., no

question whatever can arise in this court *upon any of the common counts. The special count does not state that Warner endorsed and transferred the note to Beers, either as president of the association or otherwise. But the plaintiff alleges in his declaration, that the defendant, Warner, by his endorsement, ordered and appointed the contents of the note to be paid to the association : that is to the North American Trust and Banking Company, described in a previous part of the declaration as an association doing business in the city of New-York, under and by virtue of the act of 1838, entitled " An act to authorize the business of banking." As the plaintiff, therefore, by his declaration did not entitle himself to sue on this note, except in the character of president of the association, and under the power for that purpose contained in the General Banking law, the question necessarily arises here whether the legislature had the right to pass a general statute authorizing the formation of such companies or associations as are contemplated by the act of April, 1838, and permitting them to sue or be sued in the name of their president, upon contracts made with the association itself as an organized body or company.

If the associations authorized by this act were in fact nothing but copartnerships, and the only question for our consideration was, whether the legislature could authorize a mercantile firm, consisting of many individuals, to sue or be sued in the name of one of its members, as the head of the company, or the principal manager of the concern, so as to make the decision in such suit binding upon all the members of the firm, there certainly would not, in my opinion, be any constitutional difficulty in sustaining the law, whether it was passed by two-thirds or only by a majority of the members of each branch of the legislature. It is true, that by the common law of England, and of this state, such a suit must be brought in the names of all the members of the firm, unless some of those members are mere dormant partners. The right to bring a suit in that form, would therefore give to the copartnership a remedy, which, by the common law, belonged only to a corporation.

But there is a well settled distinction between the *rights* and the *remedies* *of individuals ; which distinction is equally applicable to companies or associated bodies consisting of many individuals. A mere remedy, of the nature contemplated in the act of 1838, may therefore exist entirely independent of the idea of a corporate right or privilege. The fourteenth section of the title of the revised statutes relative to limited partnerships, 1 *R. S.* 766, gives a remedy, by suit, in a manner entirely different from that which was given by the common law to a mercantile firm : and yet no one ever supposed that this section alone could be considered as giving to the limited partnership any corporate right or privilege ; whatever might be thought as to the effect of other provisions of the same title.

Corporations exist in Scotland, as well as in England and in this country,

and the same well settled distinction exists there between the rights and privileges of corporate bodies and mere mercantile copartnerships, or other joint stock companies, as is recognized in this state and in England by the principles of the common law. Still, by the law of Scotland, and I believe by the practice of most countries where the civil law prevails, a mercantile firm or trading company may sue or be sued by the copartnership name in which they sign their obligations and make contracts—as in the name of *Sir William Forbes & Company*—although such name does not in fact designate any individual who is then in existence, or who is a member of such firm or company. *See Forsyth* v. *Hare & Company*, 13 *Shaw & Dunl. Sess. Ca.* 42. 5 *id.* 352. And even in the case of a joint stock company or partnership, who use a mere descriptive name, as the Sea Insurance Company, or the Commercial Banking Company, and who do not sign that name to their contracts, but the names of the acting managers, who sign such contracts in behalf of the company, the association may sue or be sued by such descriptive name, provided any one or more of the office bearers or members of the company are joined in the suit, so as to give the pursuers or defenders a *persona standi in judicio*. *The Sea Ins. Co. & Braidwood, Manager*, v. *Gavin*, 5 *Shaw & Dunl. Sess. Ca.* 375. *McLean* v. *Rose*, 15 *id.* 236. *Com. Bank *of Scot. and others* v. *Pollock's Trustees*, 3 *Wils.* [ **121** ] *& Shaw's Parl. R.* 365. This practice is not referred to for the purpose of showing that such a suit could be maintained here without the express sanction of the legislature; but merely to show that the mode of enforcing the remedy upon a contract is not of itself a corporate power, but is perfectly within the legitimate scope of general legislation, by laws passed in the ordinary form of majority bills. Neither can the right or privilege to sue or be sued in a particular manner, be considered as a franchise, where the same privilege is extended to every citizen of the state, or to all citizens who choose to engage in a particular branch of business, and where the privilege may be revoked at any time by the legislative power, by a simple repeal of the law by which such privilege is given, or otherwise, in the discretion of the legislative power.

The constitutional restriction upon the legislative power, which is contained in the ninth section of the seventh article of our state constitution, clearly relates to the substance of a legislative grant of corporate powers, privileges or immunities to an association or congregated body of individuals. It is, indeed, said to be one of the natural incidents of a corporation, to sue or be sued by its corporate designation, as a *nomen juris*, without the necessity of naming all or any of the individual members composing the aggregate body; so much so, that the right to sue or be sued in that manner is necessarily implied from the mere grant of any other corporate power or immunity. But I have before shown that the mere giving of such a power to a mercan-

tile or trading association, does not necessarily create a body politic or corporate, so as to bring the law giving such a remedy within this restrictive clause of the constitution. On the other hand, there can be very little difficulty in demonstrating that an association might be created with such powers and privileges, as to be a palpable violation of this clause of the constitution, although the legislature should in express terms prohibit it from suing or being sued by any corporate name, or even from using a common [ *122 ] seal in the transaction of its business. Neither is the power *to make by-laws absolutely necessary to the existence of a corporation, as the sovereign power by whom the body corporate is created may prescribe all necessary rules and regulations for its government, and prohibit the making of any others.

In ascertaining the nature and properties of that undefinable, soulless body referred to in the constitution as a body politic or corporate, we shall certainly be misled, if we attempt to confine it to such artificial bodies as by the common law of England were created only by royal charters, by virtue of the king's prerogative alone ; though corporations which were thus created have existed in such various forms, and with so many combinations of powers, privileges and immunities, that it is almost impossible to say what is or is not a corporation by the common law, by merely referring to the existence of any particular power, right or privilege, as appertaining to an association or community of individuals. Corporations created by the king's charters, however, had certain rights and privileges as mere incidents of the grants themselves ; but of which the omnipotence of an act of parliament might deprive them, without destroying their characters as corporations. And many acts of incorporation had been passed both in England and this state, previous to the adoption of our new constitution, by which corporate bodies were created with either greater or less powers than could, according to the common law, have been conferred by a mere charter from the crown. Even as late as 1837, it was found to be necessary, by an express provision in an act of parliament, to give to the crown the power to grant a charter of incorporation, which should not be perpetual, but merely limited to a term of years ; or a charter by which the members of the company would be deprived of the immunity of individual responsibility for the debts of the corporation.

Such associated bodies as were, in the language of the constitution, at the time of its adoption by the people in January, 1822, called *bodies politic and corporate*, had been known to exist as far back at least as the time of Cicero ; and Gaius traces them even to the laws of Solon of [ *123 ] Athens, who lived some five hundred years before. *Pothier's Pand. of Just. Book* 3, 109, *Paris ed.* 1823. These associated bodies, or communities of individuals, with certain rights and privileges be-

Albany, April, 1840.—Warner v. Beers.

longing to them by law in their aggregative capacity, were styled by the Romans *Collegium*, and sometimes *universitas*; as *Collegia Tibicinum*, *Collegia Aurificum*, *Collegia Architectorum* : the society, corporation or community of Flute Players, Goldsmiths, Architects, &c.   *Id. Book* 20, *p.* 110.   The terms used by one of the Roman jurisconsults to describe the nature of such a corporation, or associated body of individuals, under the laws of the republic, are perhaps as appropriate as any general language which can be used to describe a corporation aggregate at the present day, without referring to the specific object for which any particular corporation is organized.   I have thus translated it from the Latin of the Digest : " But those who are permitted to form themselves into a body under the name of a corporation, society, or other community, have within their peculiar jurisdiction, as in a similar case of the republic, property in common, and a common chest or treasury, and an agent or head of the corporation or society, by whom, as in the republic, whatever is necessary to be done for the benefit of the community may be transacted."   *Dig. Lib.* 3, *tit.* 4. (*a*).   And from time immemorial, as at the present day, this privilege of being a corporation, or artificial body of individuals, with the power of holding their property, rights and immunities in common, as a legally organized body, and of transmitting the same in such body by an artificial succession different from the natural successions of the property of individuals, has been considered a franchize, which could not be lawfully assumed by any associated body, without a special authority for that purpose from the government or sovereign power.   *Dig. Lib.* 47, *tit.* 22, *De Coll. et Corp.* 4  *Guyot's Repert. de Jurisp. art. Communante Laique. Domat's* \**Pub.*   [ \*124 ] *Law, B.* 1, *tit.* 15, § 2.   Professor Erskine, the learned Scotch civilian, says, a corporation is composed of any number of persons united or erected by proper authority into a body politic, to endure in continual succession, with certain rights and capacities of purchasing, suing, &c. as appear most suitable to the nature of that special community, and most necessary for answering the purposes intended by it.  1 *Ersk. Just. by Macallan*, 190.   Again ; " Trading companies, whose duration is generally limited by the grant to a certain number of years, are likewise proper corporations ; because they, too, endure in continual succession while they subsist." These definitions of a corporation, so far as such an invisible, artificial, and intangible being, but which at the same time assumes so many various forms, is capable of being defined by any general descriptive terms, are in substantial accordance with the definition given by Chief Justice Marshall in the

(*a*) Quibus autem permissum est corpus habere collegii, societatis, sive cujusque alterius, eorum nomine, proprium est exemplum reipublicæ, habere res communes, arcam communem ; et actorum, sive syndicum, per quem, tamquam in republica, quod communiter agi fierique oporteat, agatur, fiat.

*Dartmouth College case*, 4 *Wheat. Rep.* 636, and the definitions given by Kyd, and by Angell & Ames; and also in the Civil Code of Louisiana. And I fully agree in the opinion pronounced by the supreme court, that the associations of individuals authorized by the General Banking Act of 1838, by whatever name they may be called, have certain powers and privileges in their collective capacity, particularly the powers of holding property in common, and in a manner in which individuals are not permitted to hold it, and of transmitting such property to others by an artificial and continuedsuccession, which have, for more than two thousand years, been considered as distinguishing characteristics of what are denominated corporations, or bodies politic and corporate. Had the act of 1838, therefore, only authorized the erection of one, or of any limited number of such associations, or had that act guaranteed the continuance of the associations which might be formed under it, so as to give them any powers, privileges or immunities which might not be absolutely destroyed by a simple repeal of the law, or be otherwise modified by general legislation, I should have no hesitation in declaring that the law authorizing such associations was clearly within the [ *125 ] prohibitory clause of the constitution; and that such a law *could not be constitutionally passed without the concurrence of two thirds of all the members elected to each branch of the legislature.

I concur, also, in the opinion expressed by the Chief Justice, and by Mr. Justice, Cowen, that the legislature is authorized, by a vote of two-thirds of all the members elected to each branch, to pass a law authorizing two or more corporations, or an unlimited number of them, with such powers and franchises as the law making power in its wisdom may think proper to grant. Upon this question, I will not take up the time of the court by an attempt to add to the strong, and to my mind, the conclusive arguments which are contained in the opinions of those two judges, and in the extra judicial opinion of a distinguished member of the bar referred to in the report of the judiciary committee of the assembly of the 16th of March, 1838. *See Assemb. Doc. of* 1838, *No.* 277.

I have very little doubt, also, that this court is not authorized upon this demurrer to the plaintiff's declaration, to look beyond the printed statute book for the purpose of ascertaining whether the law of April, 1838, was passed by a two-thirds vote, or merely as a majority bill; if, indeed, a court is authorized in any way to institute an inquiry into the mode in which a law signed by the governor, and duly certified by the secretary of state, was passed. Upon this question, however, I do not intend to express any definitive opinion, as it has never been brought before the supreme court in such a manner as to give the judges of that court an opportunity to express an opinion thereon; and the conclusion at which I have arrived upon another

question in this case, renders it improper for me to review an imaginary decision of the court below, which has not in fact been made.

The language of the constitution, like the language of a statute, is not in all cases to be construed literally ; but it is to be construed according to its spirit and intent, so as to carry into effect the will of the convention, and of the people by whom this fundamental law of the state was framed and adopted. And as I have before had occasion to say, in *rela-      [ *126 ]
tion to the construction of a statute, in order to give a correct interpretation of the meaning of a constitutional provision, especially a provision, which is supposed to restrict the representatives of the people in the exercise of the right of general legislation for the benefit of every citizen of the state equally, it is proper for the court to place itself in the situation of those who framed and adopted the provision under consideration, and contemplate, as they did, the evil intended to be remedied, or the danger intended to be guarded against, for the purpose of ascertaining the true nature and extent of the change which was intended to be effected in the fundamental law by such new constitutional provision.

The present chief justice of the supreme court, who was himself a member of the convention of 1821, which framed the present constitution of this state, has, in the case of The People v. Morris, 13 Wendell's R. 325, examined the restrictive clause now under consideration in that light. He arrived at the conclusion in that case, that this restriction upon the legislative power was not intended to apply to alterations or amendments of the charters of public or municipal corporations ; such corporations not being in the contemplation of the framers of the constitution, although they are clearly comprehended within the words of the clause, " any body politic or corporate." In that construction I fully concur, so far as relates to the political powers, rights and privileges of the corporators in such public and municipal corporations. The legislature has also given the same practical construction to this constitutional provision in a great variety of cases, by giving to towns and counties corporate powers for many purposes, by mere majority bills, and by altering and amending the charters of cities and villages, and other public corporations in the same manner, for the purpose either of enlarging, restricting or modifying their political-powers and privileges.

It is known to us as a matter of public history, that previous to 1821, great complaints had been made in relation to the granting of corporations with exclusive rights and privileges, and which corporations, being in the nature of contracts *or legislative grants to the corpor-      [ *127 ]
ators, either in perpetuity or for a certain length of time, were placed absolutely beyond the control of the legislature, or of the people of the state in their sovereign capacity. Such complaints had been made, particularly in relation to corporations with banking powers. This constitutional restriction was therefore unquestionably intended to guard against the in-

crease of all joint stock corporations, either for banking or any other purposes of trade or profit to the corporators, the charters of which either gave to them exclusive privileges not enjoyed by the citizens at large, or which authorized the formation of any such companies which would, when thus formed, be placed beyond the reach of general legislation, either for a modification of their powers or the repeal of their charters. But certainly neither the convention which framed the constitution, nor the people who adopted it, could ever have contemplated a restriction of the power of the legislature, by a general act, to grant an equal right or privilege to any inhabitants of the state to associate together for any purposes of trade, or other lawful business, for their joint and common profit, so long only as that general law remained in force, and subject at all times to the control of general legislation. As this restriction has clearly failed to secure to the people of the state the benefits proposed, even as to that class of cases to which its framers evidently intended it should be applied, it certainly would be an improper as well as an unwise construction of this fundamental law of the state to extend its operation to cases which were never contemplated : such as the passage of this general law, which neither creates monopolies, nor secures to any individuals privileges which may not be enjoyed in the same manner by all others, and which does not authorize the organization of incorporated or associated bodies of men, who are either permanently or even temporarily beyond the control of the legislature.

For this reason, though I have no doubt that some of the powers given to the associations under the General Banking Law are strictly corporate powers, so as to constitute such associations bodies politic corporate, [ *128 ] so long as that law *remains in force, but no longer, I do not think the law comes within the spirit and intent of this restrictive clause of the constitution, so as to require a two third vote either to pass the law, or to alter or modify the provisions thereof by the same kind of general legislation. Upon this ground, therefore, I shall vote to affirm the judgment of the supreme court.

By Senator Root. In deciding the constitutional validity of the banking associations, under the General Banking Law, the following questions seem to have arisen :

1. Whether the associations formed under this law, are corporations, according to the true intent and meaning of the 9th section of the 7th article of the constitution ?

2. Whether a general law authorizing the creation of these bodies, is warranted by that provision of the constitution ?

3. Whether the assent of two-thirds of the members elected to each branch of the legislature, to the passage of such general law, would give to it any additional validity ?

Albany, April, 1840.—Warner v. Beers.

In my opinion, the passage of such a law as a two-thirds bill, adds nothing to its validity. The creation of *each* and *every* body politic or corporate, under the constitution, requires the assent of two-thirds of the members elected to each branch of the legislature, directly given to it, and chosen for that year in which it is created. No general law, whether passed by two-thirds or by a bare majority, can authorize the creation of any corporation intended to be restricted by the constitution. Each and every one must be created by itself, and by the direct legislative enactment of two-thirds.

The only question in this case which appears to me worthy of much consideration, is, whether these banking associations are corporations according to the true intent and meaning of the provision of the constitution. For a correct construction of a constitutional provision, or a statute law, it is suitable to look at the existing evil which the ordaining or enacting power intended to remedy, and so to apply its ordinance or enactment as to carry into effect its design. The evil the convention intended to remedy, was the creation, *by acts of incorporation, of banking and insu- [ *129 ] rance companies, and especially the former, beyond the wants of the people, and by corrupt means. They intended to make it more difficult, and the application of corrupt means less availing, to obtain charters for monied corporations. They therefore provided that the assent of two-thirds of the members elected to each branch of the legislature should be requisite to the creation of any body politic or corporate. The excess of banking, and the impure obtaining of bank charters, were the evils the convention sought to remedy.

This leads to the enquiry, whether the banking associations formed under the General Banking Law, are such bodies politic or corporate, as were intended to be restricted in their creation ? I am aware that members of the legislature, when passing that law, intended to avoid that provision of the constitution, and to give them a character not embraced in the definition of a corporation. But did they do it ? Did they accomplish their purpose ? In my opinion they did not.

A body corporate, or corporation, is an artificial person, created by the supreme power of the state, with the like powers and liabilities as a natural person, in so far as they are given or constituted by their Creator. The God of Nature has given to the natural person in civil society, certain powers, and enjoined certain duties. The legislature has given to the artificial person a portion of these powers, and enjoined a part of those duties. Those powers and duties, both in the natural and artificial person whenever obstructed or denied, are to be carried into complete exercise, by the aid of the laws, and generally through the medium of the courts. Each must have a name by which its identity may be designated, and by which it may have a standing in court. No matter what that name may be, whether given at the baptismal fount, or assumed by the person. It is sufficient that it calls itself by that name, and

that it is generally known by that designation.   This association has a name and a standing in court, else it would not be here, and for our consideration.

The natural persons of which it is composed, are not made known to [ *130 ] us ;  they are not here in *court.  The artificial person is here, and known by its appropriate designation.   Of this we are called upon to adjudicate—to pronounce upon its constitutional validity.

It appears to me that counsel, and perhaps members of the legislature, have mistaken the mere incidents that usually appertain to a corporation, for tis real constituent parts.   The learned Chancellor Kent, in his commentaries, has stated, that it is incidental to a corporation,

1. To have perpetual succession.

2. To sue and be sued.

3. To purchase and hold lands and chattels.

4. To have a common seal.

5. To make by-laws for the government of the corporation.

6. The power of amotion of removal of its members.

By the *revised statutes, part* 1 *chap.* 23 *title* 3, § 1, these incidents, or the most important of them, are declared to be *powers* of a corporation.  It is not intimated, in either the commentaries or the statutes, that they are constituents of a corporation.   They are but incidental powers, and may or may not be called into exercise, and still the essential character of a body corporate remain.   Let us examine some of the incidental powers, and see if they are essential constituents of a corporation.

1. It has perpetual succession.  Does this mean a succession of its members in perpetuity ?  For ever ?  When the king was the acknowledged source of all power, I believe his charters were generally, if not always, in perpetuity. Hence the notion that corporations, whether sole or aggregate, never die. The legislature of this state in almost every instance, has limited their duration. These associations are required to be thus limited ; but it is provided they may have succession as long as they endure, and that they do not die by reason of the death or insanity of any of their members.

2. It is incidental to a corporation " to sue and be sued," and the authority to do so is pretty essential to its existence.   That this association has that authority, and has called it into exercise, no one will deny.

[ *131 ] *3. It has also the power of purchasing and holding lands and chattels ; but were it denied that power by the act of its creation, it would be no less a corporation on that account ; nor without such denial would it be dissolved by an omission to put the same in exercise.

4. It has been insisted, and with apparent confidence, that a common seal is essential to the existence of a corporation ; that it is the mouth by which it speaks.   The artificial, as well as the natural person, when acting in the performance of its functions, must have some organ by which it can speak its will.  When the art of writing was confined to the clerks, or clergy, natural per-

sons made use of seals to signify their assent to their engagements. It was essential to their deeds. Now the artificial person makes use of such mouth, such organs of speech, as the creating power has been pleased to bestow. The association in question seems to possess organs, and by which it has made itself heard in court.

These banking associations have all the constituents, and most if not all the ordinary incidents of corporations. They are artificial persons, with all the faculties of natural persons, to perform the functions bestowed upon them by the creating power. They are monied institutions—bodies corporate—of the same character, and just such as the convention intended to restrict. The one now under consideration, not having the assent of two-thirds of the members elected to each branch of the legislature directly given in its favor, is unconstitutional and void.

By Senator VERPLANCK. The decision of these causes seems to me to depend wholly upon that of the question, whether or no associations with constitutions, powers and incidents, similar to those authorized under the General Banking Law, are bodies corporate and politic ; or, in other words, whether the General Banking Law of 1838 is void, because it was not passed with the expressed assent of two-thirds of all the members of the legislature.

The supreme court think that they " must, on these records, presume the General Banking Law to have been *passed by two-thirds [ *132 ] of all the members of the legislature." Judge Cowen, adds : " We must clearly do so until the fact is denied by plea. The requisite constitutional solemnities must always be presumed to have taken place until the contrary shall be clearly shown. Should the defendant withdraw his demurrer, and plead specially that the law in question did not receive the assent of two thirds as required by the constitution, it will then be in order to pass upon the validity of such an objection." Judge Bronson concurs more briefly to the same effect.

Now it appears to me that this point was rightly presented on the demurrers in these cases, so as to authorize and demand the decision of the court. In the case of *Bolander* v *Stevens*, especially, it is distinctly specified. The fourth cause of demurrer there specified, is this : " For that the act to authorize the business of banking, as far as the same proposes to authorize this suit, is a violation of the provisions of the constitution of this state, respecting the creation of incorporations, and is void ; and also that the said act is void, because the same did not receive the assent of two-thirds of all the members elected to the legislature, by which the said act purports to have been passed."

The authorities in the books are very strong to show that by the common law, the validity of a public act cannot be put in issue under a plea. " A man cannot plead *nul tiel record* to a public statute. *Comyn's Dig. Parli-*

*ament, R.* See also the various authorities there cited by that very learned and accurate compiler. Of these, the strongest, perhaps, is that called the *Prince's case,* 8 *Coke R.* 28, where the highest dignitaries of the law unanimously held, " that against a general act of parliament, or such an act whereof the judges ought *ex officio* to take notice, *nul tiel record* cannot be pleaded."

It may possibly be that there may occur some special cases where a plea formed to put in issue the validity of a statute, on the ground of the inherently and essentially defective mode of its enactment, might be sustained by a court anxious to obtain some great end of justice, not otherwise [ *133 ] to be reached. But the general rule of law must be in *effect and result, if not in form, the same at this day that it was in the time of Coke. The statute must be its own evidence, and cannot be rebutted. By the ordinary rules of human evidence, what mass of oral testimony could shake the strong presumptive proof of the printed statute in the edition authorized to be officially used in all courts ? Then again ; both statute law and uniform parliamentary usage have provided various guards for attesting the right enactment of every law ; and with us, the secretary of state's certificate, when " such an act became a law," after all the prior precautions, is declared in our revised statutes to " be conclusive evidence of the facts therein declared." In effect, therefore, the result of any such issue, were it made, must, unless in very rare and strange instances, be a mere nullity. According to all the rules of evidence prescribed either by ·positive law, or by natural reason, such an issue, whether " inquired of by the record," or as our statute seems now to require universally, by a jury, 6 *Wendell's R.* 512, could only end in finding what the recorded act shows on its face.

But all our authorities are strong, that " as the judges are bound to take notice of a general law, so it is their province to determine whether it be a statute or not." *Dwar. on Stat.* § 6, 30. The same author adds : " That the rule depends not on conjectural expediency, but positive law. Accordingly, the existence of a public act must be tried by the judges, who are to inform themselves in the best way they can." When we consider, too, that the rights, interests, property and peace of a large majority of citizens must rest, more or less, upon the presumed validity of enactment of statues authenticated in the forms of law and subject only to judicial revision as to their constitutional character, we cannot but see the imperious necessity of having some stable rule which should prevent the authority of every law being left to depend upon the verdict of a jury, on the accidental evidence before them. I hold accordingly, that the doctrine that " against general statute, *nul tiel record* cannot be pleaded," expresses, with the weight of old and learned authority, and in antique and artificial language a sound rule of wise general policy. But this question, in its *full extent, is only incidentally before us ; and, as the judges    [ *134 ] have intimated an opinion that some such plea might be good ;

as, too, there may be extreme and rare cases when it might be possibly necessary for the great ends of justice, I waive the expression of any more decided opinion upon this head. But the question now directly before us, is this ; whether the court cannot take cognizance of such an enactment when presented to it by demurrer, as here. Then the broad doctrine is, I think, that just stated from *Dwarris :* " The judges are bound to take notice of a general statute, and it is their province to determine whether it is a statute or not."

The decision of facts, and not of the law, belongs to the jury. Whether a law be constitutional or not, is a pure question of law. Now, a law in this state may be unconstitutional in two ways ; it may be so from its object and provisions being entirely, and under any circumstances, in contradiction to some constitutional inhibition. It may also be unconstitutional with us, because, it not having been passed with the peculiar sanction required by the constitution for bills of a certain character, it may appear to be of that character, and so to fall within the constitutional restriction.

In the title of our revised statutes regulating the enactment and promulgation of laws, it is declared, that " no bill shall be deemed to have been passed by the assent of two-thirds of all the members elected to each house, unless so certified by the presiding officer of each house." *Deemed !* By whom deemed ? Certainly by all upon whom the laws and the constitution impose the duty of judging of, or in any way giving effect and validity to those acts : as by the two houses and their officers, by the governor before approving the bill, by the secretary of state before he certifies the law. If this be so, why must we not also add, by the judges when called upon to pronounce on its authority and validity ? The expression is very broad. It is not merely mandatory to the legislature and the executive officers, nor binding only on them. The whole question of constitutionality is before the judges, and I can perceive no sound reason why courts *should require, that the known and public and recorded   [ *135 ] external facts of the manner of passing the bill should be presented to them by a verdict, like the disputed facts of a private litigation. These are already before the court, uncontradicted and undeniable, being attested by that which is not only conclusive evidence of the fact, but the highest legal authority for decision.

The official printed volumes of the acts are the usual and authentic evidence to the court of the statute law. Should it happen that some egregious error of the press, as has been known to occur, had distorted the sense of the statute, the courts might in their discretion resort to other and still better a thority, and correct the printed copy by the original statute itself. They could do this on every principle of common sense ; besides which, the " inspection of the record," when judged necessary, has the sanction of the

most venerable authorities and oldest usage of our common law.  See the ancient cases, *Dyer*, 93 ; 8 *Coke R.* 28, collected by the learned research of Mr. Noyes, in his able argument of this branch of the case.  So in later times ; before Chief Justice Pratt, 1 *Strange*, 446, and Lord Mansfield, 3 *Burr. R.* 1472, the original parliament rolls were examined to correct the printed books.  If, then, the original act, or the duly certified copy of it, could be read at bar, to ascertain the true manuscript reading of the act, why not for any other purpose, and especially to determine whether the bill shall be judicially " *deemed*" to have been passed by a constitutional authority ?

Again ; the acknowledged uncontradicted public history of the times of any law or constitution, has always been judicially appealed to for aiding in the decision of doubtful constitutional and legal interpretation.  None who are familiar with the constitutional law of the United States need to be informed of the force and the frequency with which the history of our national constitution, and of the causes that led to its adoption, were used in those memorable arguments and decisions which have illustrated the names of Marshall, Washington and Story, and established the great principles of constitutional interpretation.  The history of the *revolution and the journals of the convention were not sent down to be passed on by a jury; they were used as the proper materials for judicial reasoning.

[ *136 ]

So in this very court, the adjudication of the constitutional rule of supplying vacancies caused by death in certain elective offices, in the case of *The Register of New-York*, 11 *Wendell's R.* 511, rested, in the chancellor's opinion, which was that of the court, upon facts certainly not in evidence on the record, but still legal and constitutional authority, because found in the history of the state constitution, and the proceedings of the convention that framed it.  Still farther : the chancellor went on to examine the legislative journals, in order to shew " how little weight the act cited was entitled to as a legislative construction of the constitution ;" and then proceeded to trace the progress of legislation in subsequent years " so far (in his words) as it could be done from the imperfect journals then kept," in order to shew the intent and meaning of the legislature.  Now if uncontradicted history and public documents can be thus used as judicial authority, why are not courts also bound to receive as the conclusive legal evidence and authority for public legislative facts, the official journals, and the recorded acts kept by sworn officers and positively required to be so kept by the constitution and the laws ?  Why are these required to be thus kept, if it be not that they afford the highest possible authority, on all the facts of legislation ; first to the people, and then to all who are called upon to act or decide thereon.

Thus, finally, the question simply resolves itself into this : *It appearing*

manifest to the court, upon the highest legal authority, made binding upon them by statute, that any given law did not receive the vote of two-thirds of the legislature, are they not authorized and required to examine whether or no the provisions of the law are such in themselves, and in their legal effect and intent, as to bring the act within the constitutional restriction ? Now this surely is as much a question of law, within the peculiar jurisdiction of the court, as it is to examine whether or no any other law, passed in the ordinary form of a majority bill, did *or did not contain pro- [ *137 ] visions absolutely unconstitutional, and void in themselves.

These considerations and authorities lead my mind to the undoubting conviction, that this court, as well as the court below, is bound, whenever such a question is presented, to use the authority of known, uncontradicted and acknowledged history ; and if necessary, of the printed records and journals; and, if need yet be, of actual inspection of the original certified acts themselves, not as testimony to disputed facts, but as the best authorities for the true meaning and right constitutional character of any statute that may be brought under consideration.

If it had been assigned as a cause of demurrer, that this act was void as a violation of the article of the constitution of the United States, inhibiting any state from issuing bills of credit, that would be good ground of demurrer, and the court would have considered that point, and applied its general knowledge of the history and meaning of the words *bills of credit.* But now it is maintained that the act is void for the incongruity of its provisions with another fact, not of private history, but *publici juris,* and within the judgment and knowledge of every court.

If this question cannot be reached in this manner, it is certainly quite doubtful whether it can be reached at all, considering the high authority, as well as the strong reasons against its being permitted to be put in issue as a disputable matter of fact at all.

If this be so, an important constitutional restriction is left to the perhaps misguided discretion or the heated judgment of a legislature, whilst the greatest safeguard of the citizen's rights, that of judicial appeal, is most seriously impaired.

Nor is that security the less, I trust, because some considerable portion of the court of ultimate resort may consist of persons who took a part in enacting the law, the validity of which is impeached. The framers of our constitution foresaw, that time, the fixed rotation of office, and the contingencies of human life, would always so far change the court in such cases, as to give a large infusion of new *members, quite [ *138 ] uncommitted by former legislative acts or debates. The remainder of the court who may have participated in such legislation, must act under the influence of some previous commitment, but they will also act under the countervailing weight of argument and authority, addressed to their cool

reason, after the temporary excitement of legislative action has passed away. They must feel, too, the power of public opinion, the sense of personal character and honor, as well as the solemn responsibilities of high and sacred duties, coming home to the heart and the conscience.

Although then, we, the Senators of this state, have not, like our judicial colleagues, the enviable privilege of being consecrated to the priesthood of justice, set apart from profaner duties, and thus freed from those temptations to error which beset the best and wisest, amidst the heated contests of party, and the engrossing cares and interests of the world, often blinding the judgment and sometimes hardening the conscience, yet we cannot but feel that we, too, are for the time ministering servants at the same altar, and that we have assumed, and must act under the same dread responsibilities. Those especially of us who, two years ago, bore a part in enacting or opposing the law now under consideration, must strive to elevate ourselves to the impartial discharge of these weighty obligations. We must endeavor to raise our minds above the pride of opinion, as well as above the still more culpable weakness of abandoning our honest convictions of truth, from the dread of the imputation of being influenced by obstinacy or self-conceit, by personal interests or personal pride.

From our official knowledge of the facts of the law—from those facts being spread out on our journals—from the actual inspection of the record by some of us, we all well know that the act was *not* passed by the vote of two-thirds of each house of the legislature. We must then meet directly, and settle the question whether the associations formed under the General Banking Law, are or are not, " bodies politic and corporate."

[ *139 ]     The history and the immediate causes of this law are familiar to all of us. Great abuses in legislative grants of *special banking privileges, in the nature of monied monopolies, had induced the convention of 1821 to provide, in the amended constitution, that no law creating, renewing or altering any body politic or corporate, should be passed without the assent of two-thirds of the legislature. Very serious legal and constitutional doubts were entertained whether the same provision did not also inhibit any general laws authorizing the formation of corporations without specific legislation in each case. Opinions of much legal learning and ingenuity, and deriving additional weight from the professional and official standing of their authors, maintained this doctrine, which is again expressed by Judge BRONSON in these cases.

This very grave doubt, though not uniformly sustained by legislative practice, and certainly not by the opinions of the majorities of our legislature in later years, was yet sufficiently powerful to present a serious impediment to the passing by a two-thirds vote, any general law for the erection of monied corporations, by their own act, without further legislative interference. Strong public opinion and the requirements of trade were thought, by a large

majority of the legislature of 1838, to demand some legislation whereby the business of banking could be thrown open, under proper restraints, to all who might choose to engage in it, and this without dependence upon political patronage. Capital could not be brought into such an employment under the general unlimited responsibility imposed by our law of partnership, even if the restraining act were repealed.

It is notorious as a fact, now historical, and indeed appears on the face of the statute, that it was the deliberate intention of the legislature to attain if possible, the most important advantages that might accrue from an indefinite extension of chartered banks, according to the real or presumed wants of the commercial community, without either compelling a constant recourse to the possessors of political power in every instance, or incurring the great legislative difficulties of passing a general law, authorizing self-created banking corporations, and the consequent doubt, whether any such law would be valid under our constitution, in whatever *manner pass- [ *140 ] ed. They therefore laboured to obtain the many advantages of chartered banking corporations, without actually passing any act creating bodies politic or corporate. The question now arises, did the legislature of 1838 succeed in their intention and attempt, or did they, from error, inadvertence, ignorance, or from the positive necessity of the case, contravene the express inhibition of the constitution, by attempting to establish numerous bodies corporate and politic, in one single bill, without the required constitutional majority ?

It is a general principle of legislative interpretation, that the declared or obvious intention of the legislature is always entitled to the highest respect in the interpretation of their statutes. For the reasons above stated, the external evidence of acknowledged facts in the political history of our state, is good authority to indicate that intent. The same intention may also be shown from our journals, the very highest documentary history, and to which I doubt not that courts may refer for the meaning or intention of acts. We there find that the assembly passed this bill by the precise vote of two thirds on *ayes* and *noes*, but yet did not think it necessary or proper to give the formal attestation required by the law for a bill creating corporate bodies. The senate, by a formal vote after debate, decided by resolution, that in their judgment it was not such a bill. Besides this the intention may be shown from, what Lord Coke calls, an interpretation drawn from the bowels of the act itself, *ex visceribus statuti.* The companies to be formed under it are called associations, a name synonymous with fellowships or partnerships. They are not treated in the laws as bodies politic : those usual words creating corporations, so customary with us as to seem essential, are not found in the act. I think that no man can read the statute, without perceiving that the legislature did not intend to create bodies corporate in the legal

sense; and that if they have done so, it has been by the imperious opera-tion of law controlling their clear intent.

Now I admit that all this is not conclusive as to the legal con-[ *141 ] struction of the statute. It is still far from deciding the doubt, whether the legislature may not have misjudged as to the legal character of the companies which would be organized in conformity with their law. They may have unwittingly transcended the limits of their own power.

To deny this would be to deny the judicial right of correcting any clearly unconstitutional act, whenever such act has been passed, not wilfully, nor by palpable inadvertence, as sometimes happens, but by the legislature's delibe-rate misapprehension of the right boundaries and limits of their legitimate power.

The insolvent laws of this state, and the steam boat monopoly afterwards judicially declared, by the supreme court of the United States to be uncon-stitutional and void, were of this character.

Still the manifest intention of the legislature, that the law thus passed should not be in fact, nor be deemed to be within the inhibition of the con-stitution, gives not only some weight of authority to their view of the stat-ute, but more than that, it gives the presumptive character of constitution-ality. The contrary is to be positively shown; and if there be any doubt, that must be in favour of the law as it stands in our statute book.

Moreover, this constitutional restriction is a restraint upon the general powers of the bodies possessing the legislative sovereignty. All legislative authority is ordinarily vested in the majorities of the two houses. This is the basis of our republican system. No restriction, then, upon this general authority, should be construed to extend by mere inference or implication beyond the well settled meaning of the language used, or the acknowledged evils meant to be excluded.

What, then, is the strict definition of the phrase *bodies politic and cor-porate?*

Definitions differ in their character according to the nature of the thing to be defined. Words denoting real substances existing in nature, or any of the ordinary acts of the mind, are all to be explained and defined by stat-ing the facts and circumstances that usually accompany or follow [ *142 ] such things or acts. The word is made intelligible only *by a de-scription, by the enumeration of the attributes or circumstances in which it agrees or differs with other things of qualities somewhat similar. Thus, a name conveying an idea generalized from many individuals is de-fined and explained by describing the qualities ordinarily found in such in-dividuals. It is so in the definitions of natural objects, which are rather de-scriptions than definitions. It is often so in the definition of moral actions. But it is never so as to words or phrases denoting any artificial and purely

technical conceptions: ideas framed by the mind itself, and not otherwise found in nature. Such words or ideas are susceptible of a strict definition. In the logical phrase, they are capable of an *essential* definition, comprehending the whole meaning essential to the thing being what it is; and this for the obvious reason, that the meaning of the word is man's own meaning, being the creation of his own mind, and he can state precisely all that is essential to it. It is otherwise to the works of God, which man can describe only as far as known to him. Every such definition must be but a description of qualities, and that necessarily imperfect, since every work of the Creator possesses innumerable qualities which no human description or definition can grasp.

Strict and essential definitions can generally be given of the terms of positive jurisprudence, and particularly so in the extremely technical and artificial system of the ancient English law. This is remarkably the case, for instance, in regard to our common law terms of real estate, as fee, lease, warranty, grant, covenant, reversion, remainder, &c.; all of which are defined precisely and essentially, not explained by mere attributes. *Bodies corporate* belong to that system, and thence do we immediately derive them. What, then, is a body corporate? What is its necessary and *essential* meaning? " It is called a body corporate," says lord Coke, " because the persons composing it are made into one body." " It is only *in abstracto*, and rests only in contemplation of law." 10 *R.* 50. So again, he says, 1 *Inst.* 202, 250, " Persons capable of purchasing are of two sorts—*persons* natural created of God, and *persons* created by the policy of man, as persons incorporated into a body politic." If, leaving *the    [ *143 ] quaint scholastic teaching of the father of English law, we come to the clearer and directer sense of our own Marshall, we find the same prevailing idea. " A body corporate is an artificial being, invisible, intangible, existing only in contemplation of law. Being the creature of law, it possesses only the properties conferred upon it by its charter. Among the most important of these are immortality, and, if the expression may be allowed, *individuality*." 4 *Wh. R.* 636; 1 *Peters, R.* 46. Again: " It is precisely what the act of incorporation makes it; derives all its powers from that act, and is capable of exerting its faculties only in the manner which that act authorizes." " Within the limits of the properties conferred by its charter, it can," says Blackstone, " do all acts as natural persons may." " In corporations," says prof. Woodeson, " individuals are invested by the law with a political character and personality, wholly distinct from their natural capacity." " A corporation," says *Kyd on Corporations*, 13, " is not a mere capacity, but a political person in which many capacities reside." Thus, then, the essential legal definition that covers the whole ground, and expresses the very essence of the being of a body corporate, is this: " It is an artificial legal person, a succession of individuals, or an aggregate body

considered by the law as a single continuous person, limited to one peculiar mode of action, and having power only of the kind and degree prescribed by the law which confers them." Such is the established notion of our common law. Such too, as far as I can trace it, is the doctrine of the modern civil law, as modified by the jurisprudence of the European continent. " Communities that are lawfully established, (i. e. corporations,") says Domat, one of the great teachers of the ante-revolutionary French civil law, " are in the place of *persons*, and their union, which renders common all their interest, make them to be considered as *one single person*. *Domat, Civil Law, Lib.* 1, *tit.* 15. To the same effect a somewhat older Italian civilian speaks, *Oldradus De Ponte*, as quoted by Sir Robert Sawyer, in his very able and learned argument in the case of the city of London. 8 *St. Tr.* 1175. " *Licet non habent veram* PERSONAM, *habent* PER-SONAM *fictione juris.*" So the *older German jurisprudence, as founded on the Roman law, also held the idea of *personality* as essential to corporations. *Heineccius*, one of the most distinguished civilians of that school in the last century, in his instructive essay on the legal history of the corporate *guilds* or societies of trade so common in Germany, speaks of this personality as an attribute of all corporations. " *Universitates et contrahere possunt et delinquere, quippe quæ moraliter unam representant personam.*" *De Collegiis Opificum, in Germania. cap.* 77, § 19. This doctrine of the modern civilians of France, Italy and Germany, may be traced up even to the jurists of the Code and Pandects. PERSONÆ *vice fungitur municipium et decuria.*" *Pan.* 1, 22, *de fide juss.* I do not cite these civilians as direct authorities, but mainly to show how deeply and generally this pervading idea of legal personality and artificial individuality entered into and formed the characteristic of all corporate bodies, in those systems of law which might indirectly affect or govern our own, or tend to influence even the popular use of our legal terms.

[ *144 ]

So far was this principle of corporate personality carried in our old common law, that reasons were expressly assigned why a corporation could not be excommunicated or punished for crime. " Because it has no soul," said Lord Coke, which, however ludicrously it may now sound, was but saying quaintly, and in the style of that day, what in modern times would be expressed by saying that a corporation, being an artificial and not a moral person, must be incapable of guilt. The very able argument in the celebrated historical case of the charter of London in 1682, went a good deal into these refinements, and it was held on one side that a political person, had a mind and reason, according to Lord Chief Justice Hobart, and that its reason was expressed by its by-laws; whilst the attorney general, (whom Bishop Burnet has egregiously wronged in calling him " a hot, dull man,") argued most acutely, as well as very learnedly, in support of the capacity of a corporation to incur political, if not moral, guilt and punishment.

All these, it is true, are refinements of technical reasoning, in a taste and fashion of thought which have passed *away; but they [ *145 ] prove conclusively how strong and undoubted was that legal principle of personality upon which these mere inferences and nice distinctions were founded.

In order to continue the existence of such an artificial person, perpetual succession is ordinarily necessary, though it is not strictly essential, for it may be confined to any given number of lives in being, holding in a sort of corporate joint tenancy, of which I think examples may be found. As a legal person, it has only the powers and properties specifically conferred upon it; and can possess and exercise no others, except such as are absolutely necessary to the exercise of the powers expressly given. This is the enactment of our revised statutes, which, as our revisers rightly said in their report on that title of the law, is "declaratory of a principle of law frequently recognized by our courts, and which it was deemed useful to confirm by legislative authority." To these are added certain legal incidents by the common law, also declared in our statute, and common to all corporations, as to sue and be sued, hold and convey real and personal property, to appoint officers for its services, and to make by-laws for the management of its affairs. To these more important rights, the law adds the external evidence of a name and a common seal. This last, though apparently a matter of form, is not without effect, any more than the legal consequences of seals to instruments in England and this state, so widely different from those of other legal systems, where the distinction between sealed and unsealed instruments is unknown. It is only through a common seal and name that any grant of lands or covenant touching them, can be made by a corporation.

There are several very useful and beneficial accessary powers or attributes, very often accompanying corporate privileges, especially in moneyed corporations, which, in the existing state of our law, as modified by statutes, are more prominent in the public eye, and perhaps sometimes in the view of our courts and legislatures, than those which are essential to the being of a corporation. Such added powers, however valuable, are merely accessary. They do not *in themselves alone confer a corporate [ *146 ] character, and may be enjoyed by unincorporated individuals. Such a power is the *transferability of shares*, whereby investments may be made, without the owner losing the future control of his funds under changes of circumstances. Such, too, is the *limited responsibility* by which the stockholder, having once fairly paid up his share of the capital, is exempted from further personal liability. So, too, the convenience of holding real estate for the common purposes, *exempt from the legal inconveniences of joint tenancy or tenancy in common*. Again: there is the continuance of the joint property for the benefit and preservation of the common fund, *indisso-*

*luble by the death or legal disability* of any partner. Every one of these attributes or powers, though commonly falling within our notions of a moneyed corporation, is quite unessential to the legality of a corporation, may be found where there is no pretence of a body corporate, nor will they make one if all were combined, without the presence of the essential quality of legal individuality. This distinction has been observed and marked by Mr. Kyd, *Kyd on Corporations*, 13, with logical acuteness and precision : " A corporation is a political person, capable, like a natural person of enjoying a variety of franchises. It is to a franchise as the substance to its attribute. It is something to which many attributes belong, but *it is itself something distinct from those attributes.*"

Thus, the transferability of shares is not essential to a corporation. For instance, it does not enter into the constitution of our chartered colleges, academies, hospitals, and other corporate institutions founded by public endowment, or private beneficence. It does not enter into the charters of incorporated scientific and literary societies for mutual benefit or charity, in the funds of which the members have a beneficial interest. On the other hand, such a right of transfer may be incorporated into partnership articles, and become a fundamental condition of them. The general rule in absence of any express stipulation, is indeed the reverse of this, and in [ *147 ] practice it is comparatively rare amongst us. *Hence it has become common to consider such transferability as a clear indication of a corporate character. " We have seen," says *Collyer on Partnership*, 647, " that *in common cases*, a partner is precluded from assigning his interest to a stranger, so as to make that stranger a partner. To prevent this rule from affecting the stockholder of a trading company, there must be provision in the deed of settlement enabling each stockholder to assign or transfer his share." He then adds the limitations rendered necessary in England by the Bubble act, which has no corresponding statute here, and the conclusion of the English decisions is, that by the common law, shares may be made transferable absolutely. *King* v. *Webb*, 14 *East*, 406. *Pratt* v. *Hutchinson*, 15 id. 515. *Nichols* v. *Crosby*, 2 *Barn. & Cres.* 814. *See also other cases collected by Wordsworth on Joint Stock Companies*. Again, the joint stock companies authorized by statutes in England, are avowedly and confessedly not corporations; and there, says *Wordsworth on Joint Stock Companies*, 183, " It is the object of all companies to render their shares as negotiable as possible, so that in fact the restrictions imposed by the deed of settlement upon the transfer of shares are generally very few, and seldom extend beyond requiring the transferrer's name, &c. being registered in the books of the company." The language of two or three of the later acts of parliament is specially worthy of attention on this subject. They declare, as strongly as words can declare legislative intention, that transferability of shares, and the consequent suc-

cession, can be authorized in common law copartnerships without giving to such companies any corporate existence, or rendering them the less copartnerships in the strict legal sense of the term. In the statute of 6 *Geo.* IV. *ch.* 42, it is enacted, "that it shall be lawful for any member of any such society or *copartnership*, their respective executors, administrators or assigns, to sell and *transfer* any share or shares, or portion or portions of, or the entire stock or interest which any such member may possess in such society or *copartnership*, and the property or funds thereof, subject to such regulations and restrictions as may be required by the *constitu- [ *148 ] tion of such society or copartnership." This statute is entitled

" an act for the better regulation of *copartnerships* of certain bankers in Ireland." The preamble and recitals, and all the sections speak of these banking firms as mere copartnerships. This strongly marked and repeated recognition of them as such, in the very sections authorizing that transferability and its consequent succession, which have been insisted on as infallible marks of corporate character leave no doubt in my mind as to the intention and understanding of the British parliament, that in authorizing associations with these and other powers similar to those granted by our banking law, they were not creating bodies politic or corporate.

But this is not all : parliament has not left its meaning and intention to be a matter of inference. In 1838, another act was passed amendatory of the one just cited, and of another in relation to bankers in England, which gave similar powers. That amendatory statute, after reciting and referring to the titles of these prior acts, adds in the preamble, " and whereas it is expedient that the said act should be amended, so far as relates to the powers enabling any such copartnership, *not being a body corporate*, to sue any of its own members, and the powers enabling any member of any such copartnership, *not being a body corporate*, to sue the said copartnership. Be it therefore enacted, &c. that any person now being, or who hereafter may be, a member of any copartnership carrying on the business of banking under the provisions of the said recited acts may commence and prosecute any action, &c."

There can then be no reasonable doubt, that in these most deliberately considered and very technically drawn acts of parliament, recognizing copartnerships as having transferable stock, and giving them the authority of suing in the name of their officers and other persons, similar to those of the associations formed under our act, no bodies corporate were intended or supposed to be created.

But, on this head of transferability, we need not rely upon English authority in our own usages and decisions.

*In the articles of the Merchants Bank Association, before our [ *149 ] restraining act, a similar transferability of shares was provided, and

these articles have the authority of Alexander Hamilton for their validity.    I shall have occasion to refer to them more fully hereafter.

So again, in the case of the Albany Exchange, before it received its present charter, the validity of the partnership or joint stock company for a public enterprise, with transferable shares, was expressly recognized.   *By the Court*—COWEN, J.—" The objection taken on the argument, that this association was illegal, as being in the nature of a corporation, issuing scrip and providing for a *transfer of stock,* is not well founded.   The act of associating in this way is, we think, properly characterized by the exception taken at the trial.   It constitutes a partnership valid, as being formed for the purposes of a lawful, honest enterprise."    *Townsend* vs. *Goewey,* 19 *Wendell R.* 427. The learned judge then refers to, and adopts the authority of Collyer on Partnerships, p. 624, and the cases he cites.

Again, this transferability may be found in many sorts of trusts.    A well-known instance of this may be seen in the Tontine of New-York, originally built for the purposes of a Merchants' Exchange.   It is a trust of real estate, with transferrable shares as personal property ; it was originally settled by the most eminent counsel of this state, and its validity has been attested by nearly fifty years experience, during which, above two hundred shares have passed through courts, assignments, insolvencies, bankrupt commissions, distributions of estates, &c., without their legal transferability having ever been impeached.   *See printed articles of the Tontine, N. Y.,* 1793.

In both of these last examples, as in other instances of trusts and partnerships, lands were held exempt by operation of law from the legal incidents of joint tenancy, or tenancy in common, and the estate continued for the common purposes.   This has been noted as a mark of corporate character ; yet most corporations are limited in the extent of its exercise, some are [ *150 ]   expressly excluded from the *privilege, and very many exist legally without its actual exercise or enjoyment.

The non dissolution by death or by legal disability, is also noted in the opinion of the supreme court in these cases as a mark of a corporate body.   But that also may be found in the trusts just mentioned, and others of a similar nature, and it may be adopted as an article of ordinary partnership.   It is the settled law of England that it may be stipulated that death shall not dissolve the partnership, and further, that the executors of the deceased shall become partners.   *Collyer on Part. p.* 5, 648.   *Pease* v. *Chamberlain,* 2 *Vesey R.* 33.   *Haggerman* v. *Spears,* 7 *Pick. R.* 235.   *Wrexham* v. *Huddleton,* 1 *Swanst.* 514.

Again : a common name has been regarded as a corporate criterion. To this Lord Ellenborough gives a full answer in *Rex* v. *Webb.*   " As to the fourth point, that the subscribers have presumed to act as if they were a body corporate—how is this made out ?   It was urged that they assumed a common name, that they have a committee, &c.

But are these the unequivocal evidence and characteristics of a coporation ? How many unincorporated assurance companies and other descriptions of persons are there that use a common name, and have their committees, general meetings and by laws ?    Are these all illegal ?   or which of these particulars can be stated as being of itself the distinctive and   peculiar criterion of a corporation ?"    Thence he infers, that " these subscribers have not acted peculiarly as a body corporate."    *Rex* v. *Webb*, 14 *East's R.* 406.

But, perhaps, in the general and popular understanding, the most familiar distinction between corporate bodies and common partnerships, or other joint undertakings, is the exemption of the associates from personal liability beyond the actual amount of their respective proportions of the capital.    The regarding this very frequent and important incident of a corporation as an essential characteristic, seems not to be confined to popular opinion.    Judge Cowen says, in the decision of the cases now before us : " Among other peculiar privileges conferred on these associations, and not enjoyed by natural persons, I allude to that of the exemption of *members     [ *151 ] from personal liability for debt.    This is mentioned by *Angell & Ames*, in their treatise; as peculiar to a private corporation ; they notice it as a striking characteristic between a corporation and a partnership."    Yet our own statute of limited partnerships affords sufficient evidence that an alteration of the existing law may be made by statute, so as to exempt from personal liability beyond the stipulated share in the joint funds, for the debts; of a firm, without the remotest thought of converting such firms into bodies corporate. Besides, the right of making a contract, whereby those who tender it stipulate not to be bound  beyond the amount of some specific pledged fund, must be a natural right growing out of the very nature of contracts.    If a company or association, or an individual, offers to contract to make certain payments only to the amount of certain specific funds, and others choose to accept that contract on those conditions, there can be nothing to prevent the validity of such a contract, except some positive rule of law founded on policy or an arbitrary enactment. In the absence of such a restriction, it is and must be good.    Such a limitation, then, must be binding on all who accept the conditions.    The policy of our law and the usages of business have, indeed, rightly fixed the presumption the other way, so that the stipulation and the burden of proof of the limited indebtedness are thrown upon those who expect to be benefitted by them.    This right has been substantially admitted by the highest tribunal in Great Britain, in the case of *Minnet* v. *Whinnery*, 3 *Brown's Parl. Cas.* 323, and it was held to be good by Lord Ellenborough, in *Alderson* v. *Clay*, 1 *Camp.* 404.    The doctrine has been received as settled law by one of the best elementary writers of the day, often cited by our own supreme court.  " When a creditor," says *Collyer on Partnership*, 214, " has notice, that by an arrangement between partners, one of them, though appearing to the world as a partner, shall not parti-

cipate in the loss, and shall not be liable for it, the creditor will be bound by the arrangement."

The original articles of the Merchants' Bank, in the city of [ *152 ] New-York, as an unincorporated association, with *limited *liability*, as well as *transferable shares*, which were read in argument by Mr. Kent, have the great professional authority of Alexander Hamilton, who prepared them, and of the many eminent men who joined in them, and whose professional distinction gives to their approbation the character of a sort of judicial sanction ; whilst the restraining act passed soon after, proves, as was unanswerably argued, that the legislature and its legal advisers considered such a voluntary association, thus restraining its own liability, not as a violation of common law, but merely as contradicting the financial policy of the state.

A similar analysis of such of the customary accessary powers of specially chartered moneyed corporations, as from being most conducive to ends of profit or convenience are ordinarily considered as the essential qualities constituting corporations, will show, that all such powers or incidents are merely convenient and desirable authorities or modes of action, added to and engrafted upon the creation of a body politic ; not the legal attributes absolutely essential to a corporation, and denoting its existence as such.

Amongst us, as in England, bodies politic or corporate may exist where the ultimate personal liability is still retained. The personal liability is indeed suspended in such cases, and for a time merged in that of the artificial corporate person ; but there may be an ulterior recourse to the corporators when the former fails. Many corporate banks in other states are so constituted, and with us some chartered companies for insurance, &c., some for an indefinite, others to a limited extent beyond the capital. Corporate bodies may exist also without transferability of the rights of the corporators ; for a large majority of our literary and charitable, as well as all our municipal corporations, are so. On the other hand, by our own common law as it would exist now, independently of statatory restrictions, associations might be formed and trusts created, having every one of the above enumerated characteristics, which have been insisted upon as essential to a corporation, except that personality which I before stated as forming its strict and necessary [ *153 ] essential legal definition. The present joint stock *companies of England afford pregnant examples, showing how many of these attributes may be embodied in voluntary associations which are confessedly not corporations.

In fact the line may be very faint, and depending wholly upon the purely legal and technical character conferred, whether a joint stock association or a trust, freed by law from certain positive restraints imposed by our modern statutes, be a corporation or not. The Tontine trust, before mentioned, is managed by directors annually elected by stockholders ; its real estate is held

by trustees, continuing their trust from hand to hand during the lives of the original nominees and the survivors of them, with transferable shares, and wholly without personal liability. For the reasons already stated, the eminence of the counsel (the late R. Harrison) who prepared the trust, and the frequency with which its legal character must have passed in review before lawyers and courts, and always without objection, it may well be regarded as sanctioned judicially. It is a valid trust. Add to it a legislative charter, making the associates a body corporate and no more, what then is the effect? Simply to give a different technical character, an artificial *individuality*, in Chief Justice Marshall's phrase, a different mode of standing in courts.

Such was the actual history of the Albany Exchange. It was a joint stock company, formally decided to be valid. 19 *Wendell's R.* 427. A year or two after, (1837,) it appears by our statute book to have been incorporated. But there is probably but little difference, besides the greater convenience of the corporate body, between the former organization and the present.

The trusts specially permitted by an act of last year, *Statutes of* 1839, *chap.* 174, for the benefit of that singular people called *Shakers*, were nothing more than exemptions from the recent restrictions of trusts. They were authorized to continue, enlarge and manage their property, by trusts, as they had done before the change in that title of our law effected by the revised statutes. Had the law, in addition to this, made every Shakers' United Society a body corporate, without otherwise varying the original trust, the *only change would have been the conversion of a trust [ *154 ] into an artificial legal person, with the same effect substantially as to the interests of those beneficially interested.

Our act for general religious incorporations regulates the incorporation of churches of all religious denominations (other than those provided for in the first and second sections) by trustees, who are to be a body corporate.

Those who have had occasion to look into the mode in which dissenting religious trusts are held in England, as I presume they were, in the same manner, in New-York when a colony, will, I think, perceive that our statute adds little more than a convenient corporate character to powers elsewhere, and formerly here, exercised under trusts.

All these considerations lead me to the conviction, that for the purpose of constitutional interpretation, we must look to the strict legal meaning of the phrase *body politic or corporate*, and not to those circumstances or adjuncts, which amount only to descriptions of the manner in which such bodies are very frequently constituted when used for purposes of profit. If this be regarded as a very strict rule of interpretation, let it also be remembered, that it is applied where such strictness is most appropriate, in the interpretation of a provision, restraining the general sovereign power of the state expressing the public will through a majority of the people's representatives.

There is yet another rule of interpretation, which it is proper to state be-

fore proceeding to examine whether the associations organized under the banking law are or are not corporations.

Corporate rights are well defined by Chancellor Kent and others to be " franchises or peculiar privileged grants," of the nature of incorporeal property. Such franchises, when they are granted for pecuniary or other purposes valuable to private interest, are of the nature of monopolies, and are always granted exclusively by the sovereign power, directly or indirectly. It is a well known fact admitted on all sides, that it was part of the policy and intent of our amended constitution, to prevent, by a constitutional and fixed limitation of the legislative authority, the influence of [ *155 ]   *corruption or interest upon the legislature, as well as the abuse of political favoritism, and the dangerous union of political with pecuniary power. The clause so designed, though so general in its terms as to include even academies and village corporations, it is not doubted, referred in its policy wholly to the monopoly privileges of chartered capital, and especially to banks.

Here then, in my view, arises another branch of inquiry ; and the two distinct objects of examination are these : 1st. Do these banking associations fall within the right legal definition of the words " bodies politic or corporate," as before explained and established ?   2d. Do they come within the policy and intent of the framers of the constitution or of the people who ratified it ?

The most peculiar, and the strictly essential characteristic of a corporate body, which makes it to be such, and not some other thing in legal contemplation, is the merging of the individuals composing the aggregate body into one distinct, artificial individual existence. Now this is *not* found in the associations under the act. A *corporation* can sue and be sued only by its corporate name. It can act only according to the letter of the law creating it. " It derives all its powers from that act," says Chief Justice Marshall, " and is capable of exercising its faculties only in the manner which that act authorizes." It has no natural powers which, in its discretion, it may exercise or not. It can exercise none of those other powers, and possesses none of those other rights which the individuals composing it could possess and exercise, were it a mere society or partnership. Not so as to these *associations*. By this act, suits on behalf of such associations *may* be brought in the name of the president. Persons having claims against the company, *may* maintain their actions against the president. But there is no reason, except that of mere convenience, why the association may not also sue and be sued under their several real names, as other partners may. This reason of convenience, it is obvious, would not apply where the company was composed of a few persons, as if, for example, one of our great banking firms were to come under the law.

[ *156 ]       *It was indeed argued, that the technical construction which

gives to *may* the meaning of *must* or *shall*, applies here. But that construction holds only when there is a previous duty, to which the statute adds some new power or authority, as in the case of a public officer; or where from other reasons it is manifest that (to use Judge Story's words) "the legislature meant to impose an absolute duty, not to give a discretionary power;" otherwise, as he says, "the ordinary use of language must be presumed to be intended, unless it would defeat the provisions of the act." 1 *Peters' R.* 64. The ordinary popular discretionary sense of the word *may*, is also the ordinary legal one. The other is the exception. In our revised statutes, the words *may* and *shall* are so used and distinguished. So they are in our annual legislation, as when it is said of a company, that it *may* hold real estate, *may* take a certain rate of tolls, *may* borrow money.

Moreover, here the right to sue and be sued as other partners, is a common law right, and cannot be taken away by mere implication. "A statute made in the affirmative, without negative words," say the highest authorities, "does not take away the common law." 2 *Inst.* 200. *See also Dwarris on Statutes,* 637, *and the authorities there referred to.*

To return : if the associations issue notes for circulation, they must first comply with the express conditions of the act as to the requisite security. So far as they deal with the public as bankers, they must, for the common security, comply with the requisition of the statute. But if such an association were a body corporate, it could do nothing more than the act permits, and that only in the manner the act prescribes. In the words of our revised statutes, (declaratory, as the revisers state, of the common law,) "No corporation shall possess or exercise any corporate powers, (in addition to those expressly given in the act under which it is incorporated,) except such as shall be necessary to the exercise of the powers enumerated and given." In the *per curiam* opinion of the supreme court of the United States, 4 *Peters' R.* 179, it is said that "a corporation is strictly limited to the exercise of powers specifically conferred, cannot be *denied." [ *157 ] But here, the associates by their articles establish and form their own constitution, as any other voluntary joint stock company may do. Nor can I discover any objection, other than such as the articles might present, or prudence dictate, why the association, whilst as bankers complying with the requisitions of the act, could not also exercise their common legal rights as partners, in other commerce, waiving so far the advantages of exemption from personal liability. So, too, it seems that waiving the transferability of shares, the same associates might also trade as a limited partnership, with its president as the general partner, and the others, special partners, in any business coming within the statute on that subject. Some such union of banking with other collateral business might well take place, whenever such an association shall consist of a small but wealthy firm. An association under this act might then do what no corporation can do. The same associa-

tion under the same articles, might have one fund for its special banking purposes with a limited liability of its owners, and another for trade as general, or even as limited partners.

Again : these associations do not act by a corporate name and seal, but by another mode familiar to our law.   They can contract through their president, as a limited partnership must through its general partner.   They are authorized to sue and be sued through him ; as Judge COWEN observes, " the power of the legislature to give a right of action to one man in his own name for a debt due to another, has always been exercised from our earliest legal history, and it is now too late to call it in question."   I refer to the several legislative and judicial authorities which he has collected in his opinion on these cases.   They cannot hold real estate as a corporation does, or contract concerning it by their own name and common seal ; but, like partnerships, they can have an equitable and beneficial interest in land. *Collyer*, 70, 76.   Their president takes as a trustee, and the associates are but beneficiaries.

Similar interests in land are held in trust, as in the New-York Tontine and other old unincorporated associations ; and by the Shakers, on trusts established before the statute *restraining trusts, and since by means of a private act, merely restoring the common law as respects them, by taking them out of the operation of the statute.   Much such an interest in lands was also held by the Albany Exchange Company before its incorporation, in 1837, and the decision of our supreme court, in 19 *Wendell*, 424, admits its validity.

[ *158 ]

How then are these associations to be regarded in legal contemplation ?

I assent fully to the conclusive reasoning of the counsel, who chiefly pressed this part of the argument, (Mr. Kent,) that they are copartnerships relieved from the inhibitions of the restraining act, and thus allowed to carry on banking business under certain conditions.   The policy of the state has prohibited its citizens from issuing paper for circulation as money, or from associating together for certain banking purposes. 1 *R. S.* 711.   It reserved those privileges for corporate banks.   The act to authorize the business of banking repealed that prohibition *pro tanto*, as to all individuals or companies who would comply with its conditions.   The associations in question are partnerships complying with those conditions, and thus exempted, as any other citizens may be on the same terms, from the operation of a statutory restraint of general right, which is still binding on all who will not comply with the conditions.   This is so far in close analogy to the law of special partnership, where exemption from the general liability imposed by the law is tendered to all who comply strictly with the provisions of the statute.   The articles and certificate in this act correspond to the certificate setting forth the names of partners, amount of capital, time of termination and nature of business, required by the title of " Limited Partnerships," 1 *R. S.*

764, and with the articles which every such copartnership must have. The general partner there is authorized to transact business and contract for the rest ; so, though with less authority, is the president here. The mode of suing and being sued is precisely the same in both cases.

These partnerships are permitted to do what it has been shown other partners may also do by voluntary act, in providing for the transferability of the shares of the stock, and *also against dissolution by [ *159 ] death or insolvency. If they choose to trade with a limited liability, always desirable when the shares are numerous, they may do so in a somewhat more commodious manner than in an ordinary limited partnership, though on the very same principles. This, too, has been shown might also be done on common law principles by means of due notice, (as in the instance of the old Merchants' Bank,) without special legislation. If the associates think fit to waive this exemption, they may do so, and they are then a banking company, carrying on business precisely as any firm might do upon a simple repeal of the restraining act. Certain conditions are imposed to entitle them to the benefit of this conditional repeal. They can issue no paper, unless it be secured in a certain way and duly attested by the comptroller. The very same conditions are imposed on every individual who thinks fit to engage in this business. They are allowed to purchase real estate and hold it for certain partnership uses. So may ordinary partners. *Coles* v. *Coles*, 15 *Johns. R.* 159. 2 *Edw. Ch. R.* 28. But the conveyance is to be made to the president, who has power to sell or assign the same free from any claim against any of the shareholders, or persons claiming under them. This is rather a limitation than a grant of power. The associates are limited to their president, or some other officer named in their articles, instead of choosing such a trustee as they might please at the time; otherwise, it is with this slight restriction a mode of holding real estate familiar to the former law of trusts here, still used in England, and for many purposes yet allowed in this state. The president or other officer may receive a conveyance, and may sell or assign the lands so conveyed. Thus he holds the land in a trust, coupled with a power of disposition, as it would be called in England, or formerly here. This authority over the lands is, in the language of our Revised Statutes, "a power in trust," and the beneficial enjoyment of such a power is no peculiar privilege. The association *may* sue and be sued, just as other partners may ; but as this would frequently be of great public inconvenience, it is enacted for the mutual benefit of the associates and of those with whom *they may [ *160 ] litigate, that they may also sue and be sued in the name of their president. A mere innovation in the mode of pleading, as to certain classes of citizens, can hardly work any change in the permanent legal character of those to whom it applies. There are various English acts, within the last twenty years, expressly giving the same powers to officers or agents of part-

nerships in England and Ireland ; a course of legislation approved by lord Eldon, and still, in his view, leaving such companies mere partnerships. 1 *Russ. R.* 460. It is in effect doing in this act what had already been done in the law of limited partnership, where it is enacted, that " suits in relation to the business of the partnership *may* be brought by or against the general partner, in the same manner as if there were no special partner." 1 *R. S.* 766, § 14.

Had there been a simple repeal of the restraining act, so that limited partnerships could carry on this business, there would have hardly been any necessity for the new provision. It is to be observed, that in both cases the statutes say, *may* (not *shall*) sue and be sued, which is wholly diverse from the case of corporate bodies, which can only sue and be sued in their single corporate legal personality. These, then, are partnerships, or joint stock companies, limited as to personal responsibility, if they so elect, as they might be by the common law in one way, and by our limited partnership act in another. They may, if they deem it expedient, make their shares assignable and transferable to new partners, and their company indissoluble by death or legal disability, of individuals, as other companies may also do. They may have a beneficial interest in lands, managed by a power, with the legal estate in a trustee. They 'may sue and be sued in the name of the head of the firm, as limited partners also may, and like them, are capable of suing and being sued in the same manner as ordinary partners. Finally, they are released from the restriction of the restraining act on certain conditions being performed, and may then use their capital in banking, as all other firms might, were that law wholly repealed ; but it does not appear that they are absolutely restricted to that one [ *161 ] business *and no other, as incorporated banks are and must be, unless specially authorized to transact other business.

If this view of their nature and character be correct, they differ entirely in contemplation of law from the legal corporate person, in which all individualities of its members are merged, so far as they act. together in this body, which can perform only certain specific acts, sue or be sued but in one way, grant, convey and covenant only in its own name and by its common seal.

There is again yet another wide difference, which to my mind strongly marks the broad distinction between these associations, in which partnership rights and liabilities are still retained, and corporate bodies, where such prior joint rights of the corporators are absorbed in the individuality of the body which takes the place of the individuals who compose it. Corporations formed under an act illegally passed, or unconstitutional in itself, may be proceeded against by *quo warranto*, and on judgment the body is ousted and altogether excluded from its corporate rights, privileges and franchises. 2 *R. S.* 583. The effect of this, where an act is pronounced void, would be, that the corporation becomes extinct, is abrogated, has no longer an exis-

tence in law. Now let us suppose that this act may grant some corporate powers, as the chancellor has intimated. I do not myself find them. But we may suppose the transferability of shares, as insisted upon by our judges, to be a corporate power. An information in the nature of a *quo warranto* may be exhibited against any association formed under the banking law, and on judgment it is ousted of this or any other privilege, and excluded from it as a franchise. Be it so. What is the result? The association, debarred from this power, still remains a valid company. The exemptions from the restraining law must still be valid, for such a conditional exemption has nothing in common with any question of corporate right. It would still remain a voluntary joint stock company, carrying on a legitimate business under articles of partnership, and with limited liability, (if the associates elect,) very similar to other limited partnerships in trade. It would still have its common *law and statute partnership rights and powers, [ *162 ] though inhibited from some one or two powers enumerated in this act. It would still be what its name purports, a valid association. This criterion affords to my mind conclusive evidence of the wide difference between incorporated banks and banking associations, and I cannot but add that it also seems to me conclusive as to the validity of the act. If the legislature have in any provision inadvertently stepped beyond their constitutional bounds, that provision may be void. The main provisions of the law are within the ordinary bounds and purposes of general legislation, and the associations formed under them are legal and valid, even should there be some power mentioned in the act from which the judgment of a court may rightfully exclude them. It therefore appears to me clear, that the legislature of 1838 have succeeded in their obvious and indeed avowed intention to authorize voluntary associations, not within the two thirds restriction of the constitution, or of the legal doubts that might arise, if they were permitted to incorporate themselves under some general law.

Did they, however, succeed merely in evading the letter of the constitution, whilst they neglected its spirit? Or, in other words, do these associations, although not within the common law meaning of the phrase " bodies corporate," still fall within the policy and intent of the restriction?

If this were indeed the case, a court like this, organized expressly to qualify and regulate the decisions of inferior tribunals, (which must of necessity be governed by precedent and authority,) by infusing into the law a larger spirit of equity and general principle—such a court might well deem it their duty to disregard the rigid legal interpretation of the language of the constitution, and to look only to its intent and ultimate object. We might feel it to be our duty to look mainly at the evils intended to be excluded, without much regarding the form in which they were expected to appear, or the technical definition of the words employed to denote them. The answer

to this inquiry is obvious, and may therefore be brief. Neither the words of the constitutional restriction, which are very general, and not [ *163 ] *restricted to banking occupations, nor any thing in the history of the times, or in the proceedings of the convention, or in the reason of the matter, indicate that this was intended to limit the extent or amount of banking business or capital; for, indeed, these matters could always be controlled by general laws. The restriction was not founded, so far as appears, on any considerations of political economy or any principles of currency, true or false. Its avowed and laudable object was the preservation of political morality, of legislative purity. It was ordained chiefly, primarily and avowedly for the purpose of abridging the power of pecuniary corruption, of self interest, and of other evil influences upon the legislature, exerted for procuring grants of privileges and franchises valuable and objects of desire, because special. Auxiliary to this may have been the wish to lessen the claims and the strength of political favoritism, which it was a prominent object in the new constitution to diminish. By such a provision, a minority (it was hoped by some) might check a majority in confering the privileged favors of the state upon political partisans, or upon those who were already, or who were willing to become, subservient to power. In this sense and intention of the constitution, the two thirds clause might be thus paraphrased : " No bill creating, renewing or enlarging any body having special privileges and valuable franchises shall become a law, unless with the assent of two thirds of all the members of the legislature." Now whatever may be the wisdom or the errors of the general design of the banking law in the estimate of enlightened political economy; whatever may be the merits or the defects of its details, I cannot conceive any law less in hostility to the design of the constitution in this regard, or in effect more conformable to its spirit. This law confers no special privileges or franchises. It opens to all persons, without inquiring whether they are friends or foes of the ruling powers, the business of banking and the issuing of paper currency. Conditions are imposed not to make partial or invidious distinctions, but to promote the safety and welfare of the community. Corruption [ *164 ] and favoritism are not only excluded by *it from our legislative halls, but they are not even permitted to approach its precincts. The act, instead of granting special privileges and valuable franchises to a chosen few, has but one simple purpose. It is, that special privileges and franchises shall no longer exist.

I hold, therefore, that these associations under the banking law do not rightly fall within the true legal interpretation of the restraining clause of the constitution, and still less within its spirit and design. As I think, moreover, that it is our right and duty to look into and decide on the constitutionality of the law itself, I arrive at the singular conclusion of differing from

the supreme court on every leading point of their decision, and yet of voting to affirm their judgment.

THE PRESIDENT of the Senate, in consequence of previous indisposition, delivered a verbal opinion, in substance as follows:

In cases of so great public concernment as the present, so important both in the principles they embrace, and in the character and magnitude of the interests they involve, it is not only fitting and proper in itself, but may well be expected by the people, that every member of this court should not only express his opinion, but should also state the grounds upon which that opinion rests. In endeavouring to respond to this just requirement of official duty, I regret that the state of my health since the argument of these cases, has not permitted me to prepare and now present to the court a written opinion in these cases. I trust, therefore, that under the circumstances, I may be permitted to offer to the court *verbally* some of the views I have taken of the several points discussed by the counsel.

These cases, presenting the same general questions, were argued together. They have, therefore, been united in my consideration of them, and will be embraced in the opinion I am about to give. They arise under the act usually known as the General Banking Law, and involve its constitutionality and general validity. The pleadings were, with some few exceptions, nearly similar. The *declarations were in the usual form. [ *165 ] The defendants below demurred and assigned several distinct *causes* of demurrer, among which the defendant Bolander, under his fourth head, assigned the following : " For that the act in the declaration mentioned, entitled ' an act to authorize the business of banking,' so far as the same proposes to authorize this suit, is a violation of provisions of the constitution of this state, respecting the creation of incorporations, and is void ; *and also that the said act is void, because the same did not receive the assent of two-thirds of all the members elected to the legislature of this state, by which legislature the said act purports to have been passed.*" The demurrers were brought to argument before the supreme court at bar, at the January term, 1840, and judgment rendered for the plaintiffs. The court, for the reasons of their judgment, referred to the opinions delivered seriatim by the three judges in the case of *Thomas* v. *Dakin*, decided in that court in its October term, 1839. To these they refer as their opinions in the cases now under consideration. The plaintiffs in error seek to have the judgments of the supreme court reversed, upon the ground mainly of the unconstitutionality of the act to authorize the business of banking, under which the associations in question were formed, and these actions originally brought. It is insisted that this act is unconstitutional, because in its enactments and the manner of its passage, it violates the provisions of the 9th section of the 7th article of the constitution of this state.

This, then, presents the main question, viz. Whether the act entitled "an act to authorize the business of banking," passed April 18, 1838, is constitutional; or whether; in its provisions and the manner of its passage, it violates the 9th section of the 7th article of the constitution of the state? That section is as follows: " § 9. The assent of two thirds of the members elected to each branch of the legislature, shall be requisite to every bill appropriating the public moneys or property for local or private purposes, *or creating, continuing, altering, or renewing any body politic or corporate.*"

*It is a rule of law well established by repeated adjudications, that " no legislative act should be pronounced *unconstitutional,* unless in a clear case, where there can be no rational doubt; where the breach of the constitution is clear and unequivocal, and not one of doubtful or argumentative application.

[ *166 ]

It has also been adjudged, that " the presumption must always be in favour of *validity aud constitutionality* of laws until the contrary be clearly demonstrated."

These rules are as sound as they are salutary and safe.

Do, then, the cases under the consideration present a question of the unconstitutionality of a statute respecting which there is no rational doubt? Is the act a clear and unequivocal breach of the constitution? and has this been demonstrated, and made to appear beyond a doubt?

Although, in the case of *Thomas* v. *Dakin,* the record did not present the question as to the manner in which, or the vote by which the act in question was passed, and therefore the court reserved themselves upon that point; and although the court, in the decision of the cases now under review, gave no opinion upon this point, and perhaps it is not therefore, strictly before us on the record; yet, inasmuch as the defendant, Bolander, in the court below, did, under his fourth head, assign it as one of the causes of demurrer; and inasmuch, also, as it has been made an important point in the argument of both of the cases here, I think proper to take some preliminary notice of it.

This point presents several interesting questions, the solution of which is not unattended with difficulty.

*First.* Whether, for the purpose of impeaching or establishing the validity or constitutionality of a statute, it shall be either necessary or permitted to go behind the certificate of the secretary of state, and inquire into the manner in which the statute was passed, as well as all other matters that might invalidate or confirm it? and if so, whether the facts should be put in issue by the pleadings, and be tried *in pais* by jury, or the whole question be *determined by an inspection of the record itself, by the court in which the question is raised?

[ *167 ]

Or, *Secondly.* Whether, in all cases of statutes having the requisite certificate of the secretary of state endorsed thereon, that certificate shall be *conclusive,* and the statutes be presumed to have been passed in the manner,

and by the votes required by the constitution and laws, according to their respective characters, in order to render them valid, and give them full effect ?

The provisions of the constitution and laws which bear upon this point are the following :

The 9th section of the 7th article of the constitution of the state, heretofore cited.

The 12th section of the 1st article of the constitution : " Every bill which shall have passed the senate and assembly, shall, before it become a law, be presented to the governor.  If he approve, he shall sign it ; but if not, he shall return it with his objections to the house in which it shall have originated, who shall enter the objections at large in their journal, and proceed to reconsider it.  If, after such reconsideration, two thirds of the members present shall agree to pass the bill, it shall be sent, together with the objections, to the other house, by which it shall likewise be reconsidered, and if approved by two thirds of the members present, it shall become a law.  But in all such cases, the votes of both houses shall be determined by yeas and nays, and the names of the persons voting for and against the bill shall be entered on the journal of each house respectively.  If any bill shall not be returned by the governor within ten days (Sundays excepted) after it shall have been presented to him, the same shall be a law, in like manner as if he had signed it, unless the legislature shall, by their adjournment, prevent its return, in which case it shall not be a law."

The provisions of the revised statutes regulating the enactment and promulgation of the laws, are Sec. 3, of Title IV. of Chap. VII. of Part I. " No bill shall be deemed to have been passed by the assent of two thirds of the members elected to each house, unless so certified by the presiding officer of each house."

*" § 4. Every bill thus passed and certified, must, before it be-    [ *168 ] comes a law, be presented to the governor ; if he approves, he must sign it ; and he shall endorse thereon a certificate of his approbation, and deliver the same, so endorsed, to the secretary of state."

" § 10. The secretary of state shall receive every bill which shall have passed the senate and assembly, and have been approved and signed by the governor, or which shall have become a law, notwithstanding the objections of the governor, or which, not having been returned by the governor within ten days, shall have become a law, and shall deposite such laws in his office."

" § 11. He shall certify and endorse upon every such bill, the _day, month and year when the same so became a law ; and such certificate shall be conclusive evidence of the facts therein declared._"

" Section 10 of Title VII. of Chapter VIII. of Part I. of the Revised Statutes.  He (the state printer) shall print in volumes, of 8vo. size, so many copies of the laws of each session, with the concurrent resolutions and indexes that shall be delivered to him for that purpose by the secretary of

state, as shall be annually directed by the secretary of state, who shall also revise and correct the proof sheets."

" § 12. All laws passed by the legislature may be read in evidence from the volumes printed by the state printer, in all courts of justice in this state, and all proceedings before any officer, body or board, in which it shall be thought necessary to refer thereto."

It is thus made the duty of the presiding officer of each house of the legislature, in all cases of bills requiring for their passage the assent of two thirds of the members elected to the same, to certify that they have received such assent, and no bill is to be deemed to have passed with such assent, unless so certified. But every bill duly passed and certified, and which has been approved and signed by the governor, or which, notwithstanding his ob. jections, or not having been returned by him within ten days, has become a law, is to be delivered to the secretary of state, who is to certify [ *169 ] and endorse thereon, the *day, month* and *year* when *the same so *became a law ; and such certificate is to be conclusive evidence of the facts therein declared*, viz. that on a certain day, month and year *such bill became a law*. These laws are, then, to be printed by the state printer, and may be read in evidence from the printed volumes, in all courts of justice in the state.

These several provisions would seem to conflict with each other; but should receive such an interpretation, as, while it gives effect to each, shall, if possible, secure the harmony of all. If the certificate of the secretary of state, endorsed on each act, be *conclusive*, that on the day, month and year mentioned therein the act became a law, this would seem to import that up to that time every form had been observed, and every thing done, necessary to give the act according to its nature, validity and effect; and any inquiry beyond that certificate would be not merely superfluous, but improper. But if, on the contrary, the provision of the statute, that " no bill shall be deemed to have been passed by the assent of two-thirds of the members elected to each house, unless so certified by the presiding officer of each house," is to receive the enlarged interpretation contended for by the plaintiffs in error, and is to extend to, and be binding on all courts and officers called upon to give effect to such acts, then the certificate of the secretary of state loses the *conclusive* character given it by law; and all courts and officers called on to decide upon the validity, or to give effect to any act of the legislature, are not only at liberty, but are even required to disregard that certificate, and to go behind it, and inquire in what manner and by what vote the act was passed by the legislature; indeed, in what manner it passed through all its various stages, until, *as a law* it was deposited in the office of the secretary of state, and thus became a *public record*.

The evils which would necessarily result from such an interpretation can hardly be imagined. That certainty *as to what is the law*, which is so im-

portant to all, and which it has been the object of the statute to establish, would be at once destroyed, and every thing be thrown into doubt : for, if this doctrine be once admitted as correct, *it is not readi-    [ *170 ] ly perceived why it *may* not, indeed why it *must* not be extended to all legislative acts : as well those which require for their passage the assent of only a majority of a quorum present, as those which require for that purpose the assent of two-thirds of the members elected to each branch of the legislature.   This broad interpretation once admitted, it would be as difficult to limit these inquiries, as it would be to calculate their inconvenience, or compute their mischiefs.   But what would be only *difficulties* within our state, would be *impossibilities* out of it.

But by adopting the more restricted interpretation of this provision, contended for by the defendants in error, limiting its direction to the governor and secretary of state ; and considering its purpose merely to advise them as to the manner in which any act had been passed by the legislature, that the former might the better judge whether to approve and sign, or return the same with his objections thereto, and the latter endorse the required certificate, effect would be given to all the provisions of the statute, and they would stand in harmony together.   The certificate of the secretary of state would retain the *conclusive* character which was evidently intended to be given to it, and the statute book, as directed, would present to all, conclusive evidence of the statute law of the state.

I cannot but think that this interpretation, while it seems not to be a forced one, would afford at once the most convenient and safe rule in all cases of this kind.   The number of votes, however, by which all bills under the 9th section of the 7th article of the constitution are required to be passed, being of the *essence* and *vitality* of the law, and the provisions of the constitution being of authority paramount to any statutes enacted under it, presents the only formidable difficulty, and raises the main doubt as to the rule in question.

But admitting the inquiry as to the number of votes, by which any bill under the 9th section of the 7th article of the constitution has been passed, to be proper, notwithstanding the certificate of the secretary of state, that on a certain day, month and year *the bill had become a law ;* the question 'then arises, in what manner shall this inquiry be made ?   Shall it be put in issue by the pleadings and tried *by a jury, or be de-    [ *171 ] termined by inspection of the court in which the question arises ?

The statute, in its provisions and operation, is not limited to any one, or any specified number of individuals, but extends to every citizen of the state who may choose to avail himself of it.   It is not confined to any private interest or pursuit, but professes to regulate a branch of trade or business, and embraces a great public interest alike important to all.   It is, therefore, *a public act ;* and having received the requisite legal sanctions, and been de-

posited in the office of the secretary of state, it has become a *public record.*

I am, therefore, clearly of opinion, that the question whether this act of the legislature *be a law,* is not a question of *fact,* to be tried by a jury, but one of *law,* to be determined by the court only, and that by an inspection of the record. That record imports verity. Its truth cannot be determined by a proceeding *in pais,* but must be decided by itself on inspection. This opinion rests upon the highest authorities, both ancient and modern. The precedents are numerous and conclusive, that at common law, the validity of a public act cannot be put in issue by a plea. A man cannot plead *" nul tiel record"* to a public statute. Even in one of the most remarkable cases in the English books it was held unanimously by the most distinguished legal lights of that day, that " against a general act of parliament, or such an act whereof the judges ought, *ex-officio,* to take notice, *nul tiel record* cannot be pleaded ;" and an act of parliament became necessary to remove the evil sought to be remedied by the proceedings in that case. This doctrine, unless necessarily modified by the revised statutes, is as sound and salutary here as it is elsewhere.

A contrary doctrine, indeed, would seem to be fraught with equal absurdity and mischief. A proceeding *in pais,* if admitted, might extend to the investigation of even the purity of the acts of the legislature, and to the constitutional rights and official conduct of its members. The idea of thus putting on trial before a jury the official conduct of members of the legislature, in a mere collateral proceeding, *in which they are in no respect parties, and are wholly unheard, is in itself monstrous, and would be equally a violation of their constitutional rights, as it would be of the plainest dictates of justice. The very difficulties, not to say mischiefs of such an investigation, in whatever form it may be pursued, constitute so many arguments in favor of the other rule, viz. that of considering the certificate of the secretary of state *conclusive,* and of allowing no inquiry beyond it. This would be giving to that certificate and to the statute book the character which the legislature clearly intended. This rule would be as convenient in practice as it would seem to be sound in theory. It would leave our courts to judge of the constitutionality or unconstitutionality of an act of the legislature solely by its own provisions, as they appear upon the face of the act itself; unembarrassed by any preliminary inquiry as to the manner in which, or the votes by which it had been passed.

[ *172 ]

With these general remarks, and without expressing any more decided opinion upon this preliminary point, I now proceed to the consideration of the main questions presented in these cases. 1. Are the associations formed under the act, entitled " an act to authorize the business of banking," passed April 18, 1838, *bodies politic or corporate,* within the spirit and true intent of the 9th section of the 7th article of the constitution of the state ?

To determine this question, it will be necessary to inquire what is *a corporation or body politic ?* Corporations, as to the number of their members, are either *sole* or *aggregate.* These again are various, according to the objects of their creation. A *corporation sole* embraces but a single individual, with corporate powers. The definitions of a *corporation aggregate* have been almost as various as the authors who have written upon the subject. These authors have occupied themselves more in an enumeration of the powers which these bodies politic or corporate take, as incidents of their creation, than in specific definitions of a corporation. They have, therefore, been rather *descriptions* than *definitions ;* descriptions of the attributes, rather than definitions of the very being of a corporation. *Blackstone,* for example, defines a corporation to *be a franchise, in its most [ *173 ] enlarged sense. " It (a corporation, when formed) acquires many rights, capacities and incapacities. Some of these are necessarily and inseparably incident to every corporation : which incidents, as soon as a corporation is duly erected, are tacitly annexed of course ; as 1. To have perpetual succession. This is the very end of its incorporation; for there cannot be a succession forever without an incorporation. 2. To sue and be sued, implead and be impleaded, grant or receive by its corporate name, and do all other acts, as natural persons may. 3. To purchase lands and hold them, for the benefit of themselves and their successors. 4. To have a common seal. 5. To make by-laws."

*Kyd,* in his admirable *Treatise on Corporations,* says : " A corporation, or body politic, or incorporate, is a collection of many individuals united in one body, under a special denomination, having perpetual succession under an artificial form, and vested by the policy of the law, with a capacity of acting, in several respects, as an individual, particularly of taking and granting property, contracting obligations, and sueing and being sued ; of enjoying privileges and immunities in common ; and of exercising a variety of political rights, more or less extensive, according to the design of its institution, or the powers conferred upon it, either at the time of its creation, or at any subsequent period of its existence." " It (a corporation) is not a capacity, but a political person, in which many capacities reside. It is a political person, capable, like a natural person, of enjoying a variety of franchises. It is to a franchise, as the substance to its attribute. It is something to which many attributes belong ; but it is something distinct from those attributes." " When a corporation is duly created, many powers, capacities and incapacities are tacitly annexed to it, without any express provision." Although this author gives substantially the same enumeration of the powers of a corporation aggregate when created, as is given by *Blackstone,* yet he subsequently says : " It is material to observe, that though many things be incident to a corporation, yet to form a complete idea of a corporation aggregate, it is sufficient to suppose it *ves- [ *174 ] ted with the three following capacities : 1. To have perpetual suc-

cession, under a *special* denomination, and under an *artificial* form.    2. To take and grant property; to contract obligations, to sue and be sued by its corporate name, in the same manner as an individual.    3. To receive grants of privileges and immunities, and to enjoy them in common.    These alone are sufficient to the essence of a corporation."   This author criticises, with some severity, the epithet " *invisible*," often applied to corporations.   *Angel & Ames* considered this criticism just, and think it applicable also to the epithet " *intangible*," also applied to corporations.

Our own great commentator, *Kent*, enumerates the incidents and powers of a corporation as follows: " 1. to have perpetual succession, and, of course, the power of electing members in the room of those removed by death or otherwise.    2. To sue and be sued, and to grant and receive by their corporate name.    3. To purchase and hold lands and chattels.    4. To have a common seal.    5. To make by-laws for the government of the corporation.    6. The power of amotion or removal of members."   This commentator gives the following as the essence of a corporation : " The essence of a corporation consists only of a capacity to have perpetual succession, under a special denomination and artificial form ; and to take and grant property, contract obligations, and sue and be sued by its corporate name ; and to receive and enjoy, in common, grants of privileges and immunities."   In this statement of the essence of a corporation, Chancellor Kent agrees substantially with Kyd.

Justice *Cowen*, in his opinion in the case of *Thomas* v. *Dakin*, says, that " the grand test of a corporation, is the mode in which property succeeds from one to another."

In the revision of the laws, which took effect in 1830, our legislature enacted as follows: " § 1. Every corporation, as such, has power, 1. To have succession, by its corporate name, for the period limited in its charter, and when no period is limited, perpetually.    2. To sue and be sued, complain and defend in any court of law or equity.    3. To make and use a common seal, and alter the same at pleasure.    *4. To hold, [ *175 ] purchase and enjoy such real and personal estate as the purposes of the corporation shall require, not exceeding the amount limited in its charter.    5. To appoint such subordinate officers and agents as the business of the corporation shall require, and to allow them a suitable compensation.    6. To make by-laws, not inconsistent with any existing law, for the management of its property, the regulation of its affairs, and for the transfer of its stocks."

These are the declared incidents of corporations generally.  Particular corporations, or *quasi* corporations, such as counties, towns, and certain public officers and boards, are expressly declared such, and have special corporate powers granted to them by statute, according to their respective objects and functions.

It will thus be perceived, that the above are rather enumerations of the powers, rights, capacities and incapacities incident to a corporation aggregate, than a *definition of* what precisely such corporation is. They are descriptions of the attributes, either essential, or ordinary but not essential of a corporation, rather than definitions of a corporation itself; which, as Kyd says, " is something to which many attributes belong, but is itself something distinct from those attributes." Chief Justice Marshall gives the following definition of this legal entity. He says: " A corporation is an artificial being, invisible, intangible, and existing only in contemplation of law. Being the mere creature of law, it possesses only those properties which the charter confers upon it. Among the most important of them are, *immortality*, and, if the expression may be allowed, *individuality ;* properties by which a succession of many persons is the same, and may act as a single individual."

From the foregoing it will be perceived that it is material to distinguish between the powers and capacities of corporations, which are mere incidents of their existence and flow from the very act of their creation, and that artificial being or legal entity which constitutes the corporation itself. The latter, according to its nature and objects, may exist with more or fewer of the former. Indeed, writers *seem not to be well agreed, [ *176 ] as to which, or how many of those powers, capacities or attributes are essential to the existence of a corporation aggregate. While some invest them with all, others consider a single one of them only as essential. However the truth may be, it would seem to be equally illogical, equally reversing the true order of things, to consider the granting of any one, or all of these attributes as creating the corporation; instead of considering them, as they are, as mere incidents of the corporation, and flowing from its creation. The corporation first exists, and the necessary attributes follow as incident to its existence. I here speak of *express* corporations ; and this leads me, before examining the powers granted to the associations under the General Banking Law, with a view to compare them with the essential attributes of a corporation, to consider the manner in which corporations are created.

Corporations are exclusively creatures of the law, creations of the sovereign power, and are either *express* or *implied.* 1. An *express* corporation is where an individual or body is expressly constituted and declared to be a body politic or corporate, by a given name, and for a specified object. Its essential powers, according to its nature and object, and within the enumeration of the statute, flow from this act of creation, and as incidents of the body created. 2. An *implied* corporation is where there is a grant of such corporate powers as necessarily imply either the existence of, or the intention to create, a corporation.

It is, perhaps, too late, and might now be deemed hardihood to express even a doubt whether, under our present state constitution, any corporation

can be created by *implication*. None such, existed under the Roman juris-prudence. They adopted the safer rule requiring, in all cases an express grant. It is also true that such implied creations, even in England, have been very rare, and so still more in this country. In neither has a corpora-tion been created *by implication*, except in cases where corporate powers were necessary to the exercise of other beneficial powers or privileges expressly, granted, or for the protection of important interests, or the execu-

[ *177 ]    tion of *important trusts. They have, too, always been at the so-licitation of the person or body claiming such corporate character, and in conformity with the clearly indicated intention of the power making the grant. It is believed that such corporations have never been implied in opposition to the wishes of the parties interested, or contrary to the intention of the granting power. Much less has it ever been heard that such implica-tions have been made in order to destroy their own existence, and thus defeat the salutary operation of an important and beneficial general statute. Inde-pendent, then, of strong considerations of public policy, the very *rarity* of the cases of implied corporations, both in England, and more especially in this country, should raise a strong presumption against their existence, except in cases of their acknowledged necessity, and of the clearly indicated inten-tion of the power creating them.

Keeping in view these general principles, I come now to examine more particularly the statute itself, with reference to the question, whether the as-sociations authorized and formed under it are corporations. 1. It will not be pretended by any one that the statute has any where *expressly* created or authorized corporations. 2. Has it done so by implication ? This, then, is the important inquiry.

In order to constitute the associations in question corporations *by impli-cation*, they must be brought within the rule in relation to such corporations, before laid down, and which is well established, as well by elementary wri-ters, as by repeated adjudications both in England and in this country.

1. Did there, then, exist any necessity for constituting these associations *corporations by implication ?* Was it necessary to the full exercise of other powers granted in the statute, for the protection of any important interest, or for the execution of important trusts ?

On the contrary, in the case of the associations authorized and formed under the statute in question, no such necessity of implying corporations ex-isted, either for the purpose of giving fuller effect to the other beneficial powers and privileges granted in the statute ; for the protection

[ *178 ]    of the rights *and interests which might be organized under it ; or for the complete attainment of its great salutary public ob-jects. Their faculties and powers, as simple associations, joint stock com-panies or copartnerships, both at common law and under the statute, were amply sufficient for all these important purposes.

· 2. Have the friends of free banking ever asked that the associations authorized for that purpose by the law in question, should be constituted corporations ? or,

3. Has the legislature ever declared, or even any where indicated such an intention ?

On the contrary, the history of the · times , abundantly shows, that the wishes of the friends of this new system, as well as the demands of public opinion generally, were exactly the reverse.   Let us for a moment examine this point.

What at the passage of the law in question, was the requirement of public opinion upon this subject ?   A vague, undefinable, but extensive and strong feeling, produced mainly by the abuses of an old system, had sprung up, and was abroad against corporations with exclusive banking powers. They were considered monopolies ; the restraining law had, in truth, made them so ; and they had become odious.   The people claimed to be restored to their original equal rights upon this subject.   They demanded that the right to deal in money should be as free in its exercise as that of dealing in wheat or in cotton bales, having always a due regard to the soundness and safety of the currency.   Public opinion, therefore, required the passage of a law, which, while it continued to the people the benefits of a safe system of banking, should restore to them their original rights, and avoid the principle of monopoly contained in the banking corporations then in existence under the restraining law, and to which the public opinion had become hostile.   Such, then, was the requirement of public opinion.   To this requirement, well understood by the representatives of the people, coming fresh from among them, did the legislature, who enacted the law in question intend to respond.   Have they done so ?   If they have not, they have not carried *out their own clearly indicated intentions, or well under-    [ *179 ] stood the true character of their own acts.

The whole history of this law, from the first inception of its project to its final consummation, is replete with evidence the most conclusive, not merely that the legislature, in the enactment of the law, had no intention to create or authorize the creation of corporations ; but that it had the intention most clearly manifest to avoid both.   The committee in the assembly, in presenting the bill that finally became the law in question, after referring to the bill of the preceding session upon the same subject, and to the attorney general's constitutional objections thereto, expressly say, that " in presenting a bill for the consideration of the house, the committee have studiously avoided every thing that would constitute associations to be formed under its provisions, *corporations ;* and they therefore think the constitutional objection cannot, with any propriety, be raised."   The several legislatures, in their .action upon this subject, evinced the most anxious solicitude and intention faithfully to respond to the sentiments of the people, by putting this law in

such form as to avoid constituting the associations authorized and to be formed under it, *corporations*. It is manifest, then, 1. That there exists no necessity, in order to give full effect to the powers and privileges granted in this statute, and to accomplish its great beneficial public objects, to *imply* that the associations authorized by, and formed under it, are *corporations*. 2. That this has neither been asked for by the friends of the law, nor required by public opinion. 3. Nor has there been any such intention indicated by the legislature, in preparing, maturing, and finally consummating this great measure of public policy.

Let us next see if, in the absence of any necessity of the case, in opposition to the oft and clearly expressed wishes of the parties interested, and contrary to its own intention, the legislature has, in the enactment of this law, by the use of inapt words, or the introduction of provisions not well understood at the time, defeated its own and the will of the people; and by *necessary implication*, created or authorized the creation of an indefinite number of *corporations*.

[ *180 ]        *I do not propose to go into a minute, detailed, and critical review of the several powers and privileges granted by this law to the associations authorized under it.    But by a careful examination of those powers and privileges, it will be clearly seen that they are such, as even at common law, maybe claimed, and have been long exercised by simple associations, copartnerships, or joint stock companies.    Even admitting, which is readily done, that this law does confer upon the associations, authorized under it, some of the ordinary powers of a corporation, it by no means follows that they are thereby constituted *corporations*.    It is here material to distinguish between the *creation of a corporation*, either *expressly* or *by implication*, and the mere granting of one or more corporate powers to an unincorporated association or company.    The latter may be done, and has often been done without accomplishing the former.    The instances are numerous in Great Britain, in which important corporate powers have been granted to joint stock companies, and other associations not being bodies corporate, without thereby constituting them such.    And shall we, in this land of free and equal government, beccme great sticklers for these corporate existences, and carry the doctrine of their creation, by *implication*, still farther than has yet been known even under the monarchy of Great Britain, that country of *franchises* and *prerogative?*   I trust not.

In every view, therefore, which I have been able to take of this point, I come to the conclusion, that *the associations, authorized under the law in question, are not bodies politic or corporate,* according to the spirit and true intent of the constitution.   This, if it be conceded, would be sufficient to decide these cases, and render further inquiry unnecessary.   But inasmuch as other points were presented on the argument, it may be proper for me to notice them.

Albany, April, 1840.—Warner v. Beers.

II. Admitting then, for a moment, *the associations* in question to be *corporations*, does the law authorizing them come' within the provisions of the 9th section of the 7th article of the constitution?

*To arrive at the true intent and meaning of this clause of the   [ *181 ] constitution, and to ascertain and fix the just *limits* and *extent* of its operation, it is to be subjected to those well established rules of interpretation, which are applicable as well to all ₜconstitutional law, as to statutory enactments and conventional compacts. *First*, then, this provision of the, constitution is *new*, and is in restraint of a common right ever before exercised, the right in the legislature of passing, and that of the people to have passed, by a vote of a simple majority of a quorum of their representatives in each branch of the legislature, all laws necessary for the public good. That a majority should govern, is not only an axiom in all free governments, but is a fundamental principle of the social compact itself. This new provision of our constitutional law is a departure from this great principle, as it is in restraint of common, right: It is, therefore, to be construed *strictly*. But it is insisted that this provision of our new constitution is *remedial*, and is, therefore, to be construed *liberally*, for the attainment of its beneficial object. So, too, is all penal law *remedial*. Its benign and beneficial object is either to prevent anticipated, or remedy existing evil; and yet it has no less, on that account, received, under every well organized and well administered government, *a strict construction*. The soundness of this rule, as a general one, must therefore, I think, be admitted by all. Is there, then, any thing, either in the nature, or has there been any thing in the operation, of this new provision of the constitution, that should commend it to special favor, and constitute it an exception to this sound general rule? What is its nature, we have seen. What has been its operation, now let us inquire of the past.

"History," it is said, "is philosophy teaching by example," and it has also been often and well said, that "*time* and *experience* are the best instructors in matters of government." And what lessons do these teach us, and to what conclusions, under their guidance, are we led, as to the operation and results of this new provision of our constitution? Are they not, 1. That it has utterly failed to accomplish its *own   [ *182 ] professed object? The history of our legislation, during the very first years of its operation, furnishes abundant proof of this. Many more acts of incorporation, and those, too, of the most odious character, were passed during that period, than had been passed during a similar period previous to the existence of this new restrictive provision. 2. Besides its utter failure to accomplish its own declared object, this new provision has, in its operation, led to the introduction of another evil, still greater than that it it is proposed to remedy. I allude to those combinations of several distinct interests, with a view to force the passage together of several measures, neither of which could pass upon its own separate merits and favor. Experi-

ence, I fear, has already taught us that this is an evil far greater than that originally complained of; more corrupting to the purity of our legislation; more dangerous to the public interests, and more destructive to the public morals. No argument, therefore, can be drawn either from the *nature* or *operation* of this new provision of our constitution, in favor of either enlarging its interpretation, or extending its application beyond its own *strict constitutional* requirement.

*Secondly:* In interpreting this restrictive clause of the Constitution, regard should be had to the causes which led to its adoption, and to the intention of those who framed and ratified it. Upon this point Judge Story says, " the first and fundamental rule in the interpretation of all instruments, is to construe them according to the *sense of the terms* and *the intention of the parties.*" *Blackstone,* on the same point, remarks, that. " the intention of the law is to be gathered from the words, the context, the subject matter, the consequences and effects, *or the reason and spirit of the law. That the reason and spirit of the law, or the causes which led to its enactment, are often the best exponents of the words, and limit their signification.*" Vattel adopts the same principle of construction. He says, " the interpretation should only tend to the discovery of the will of the contracting power ; we should then attribute to each term the sense which he who speaks [ *183 ] had probably in his mind. The intention *sufficiently known, furnishes the true matter of the convention. To violate a treaty is to go contrary to the intention sufficiently manifested, rather than against the terms, in which it is conceived; for the terms are nothing without the intention that ought to dictate them." These rules of interpretation are approved by our own great elementary writer, Kent; and have been recognized and adopted in the solemn adjudications of our courts. The latter in the case of the Utica Insurance Company, expressly recognize the ancient rule, " that a thing which is within the letter of a statute, is not within the statute, unless it be within the intention of its makers." This rule of construction is as venerable for its antiquity, as it is for the soundness of its principle.

Keeping, then, these general rules in vew, let us proceed to inquire what were the *causes* which led to the introduction of this new provision into our Constitution ? what was the *intention* of the convention and the people in its adoption ? and what was the *evil* complained of which it was the object of this new provision *to remedy ?* Upon this subject I cannot but think that there has been, if not error, at least much vagueness. The evil which had attracted the public attention, excited the hostility of public sentiment, and called for a remedy, was not so much the too frequent creation of corporations generally, as it was the *exclusive character* and undue multiplication of those of a single class, possessing and exercising banking powers. As a proof of this is the fact that there were, at that period, in existence and full

operation, five general statutes upon different subjects, each authorizing the creation of an indefinite number of corporations ; and that these statutes remained not only unrepealed, but unrestricted by the new Constitution.  Besides, what is there in a simple corporation that should thus arouse or justify the public hostility ?  In language used elsewhere, and on a different occasion, I would ask what is this declared odious creature of the common law, a corporation, and what its legitimate objects ?  It is neither more nor less than the legal association of several persons, under a corporate name, for the purpose of accomplishing that *which is beyond         [ *184 ] the compass of individual means.  Its simple uses are, the more convenient management of its property and affairs, and the more effectual accomplishment of its authorized and proper objects.  This is true, whether it be for a charitable, literary, manufacturing, banking, or any other purpose.  Is this, in itself, *a monopoly ?*  Is this taking a right common to all, and granting it *exclusively* to a few ?  Since the multiplication of charitable corporations, has any philanthropist felt his *right* or his *duty* of individual benevolence restrained ?  Has the existence of colleges, academies, and other literary corporations, rendered the exercise of individual effort, or the application of individual means in the great cause of education, either less *free* or less *effectual ?*  Have the numerous manufacturing incorporations impaired the right, or diminished the efficiency of individual capital and enterprise ?  And even the great and mischievous increase of bank charters, has it deprived individuals of the right of banking ?  Certainly not.  Upon this last point there exists in the public mind great error.  It is not simply the granting of bank charters, that restrains private banking ; but a general law, known as *the Restraining Law*, and which, I cannot but think, had its origin in narrow views and a mistaken policy.  This law is not a *two thirds act*, but was passed by a simple majority, and may be modified or repealed by the same.

If such be the simple character, and such the objects of a corporation, it may be asked, in what respect the sound and legitimate action of these corporations is either odious to the common law, or inconsistent with its purest principles ?  In what particular are they, in their character, aristocratic ; or, in their operation and tendency, either inconsistent with, or unfriendly to the principles of liberty ?  If to accomplish objects of charity, of usefulness, and of public good ; to give to industry in all its departments increased activity, and a more ample reward ; and thereby diffuse throughout community an increased and more general prosperity—if to achieve great and important public improvements, which are beyond the compass of individual wealth *and enterprise, to add to a nation's power and         [ *185 ] erect monuments to her glory—if these be odious to the common law, aristocratic and unfriendly to liberty, then indeed do these institutions deserve that character.  Can it be that the multiplication of these constitut-

ed the *evil* complained of, or its *remedy* the motive and object of the provision in question of the new constitution? I think not. We must look beyond these for both; and they are, I think, both palpable.

The right of banking was originally a common right, and had been so enjoyed until the passage of *the restraining law*, which converted that which had been a common right into *a great state monopoly*. From this moment every bank charter was a special grant of a portion of this monopoly; and was the more valuable, as that monopoly was the more *absolute and exclusive*, These charters, therefore, became the objects of general and fierce scrambling. Greedy applicants thronged our legislative halls, and corruption dared to approach legislative integrity. It was this that had aroused the public attention, and excited the public hostility. This sentiment of hostility was much increased by the manner in which these charters had been obtained, and their benefits distributed. They had become at once the *motive* and the *means* of corruption. They had, too, under an organized system, become allied with political power, and were used for the promotion of political and party objects. It was this that constituted the great *evil* justly complained of by the people, and not the mere multiplication of acts of incorporation. It was this that at once constituted and gave aggravation to the *evil*, and acerbity to the sentiment of public hostility against it. It was this, too, that led to the introduction, into the new constitution, of the restrictive provision in question.

Having thus ascertained and stated what I believe to have been the *real evil* complained of, and for which the 9th section of the 7th article of the constitution was intended as a *remedy;* let us next proceed to inquire whether *the General Banking Law* is within that *evil* and of course [ *186 ] within its *remedy;* or whether, either in the framing or the adoption of this restrictive clause of the constitution, such a case, as that presented in the General Banking Law, was either in contemplation, or intended to be included in its provisions? The phraseology of the clause is general, and would seem to have *literally* no exception. I do not propose to enter into a critical examination of the words of " every bill" or " any body politic or corporate," used in that clause, with a view to ascertain whether it was intended to be limited in its operation to the case of a special law creating only one corporation, or to be extended to a general law, creating or authorizing the creation of an indefinite number: For, however that question may be decided, if the ancient rule, " that a thing which is within the letter of a statute is not within the statute, unless it be within the intention of its makers," be as sound as it is ancient, then it is possible that the General Banking Law may be within *the letter* of this restrictive clause, and yet not be within its *spirit and true intent*, and of course, not within the restriction of the clause itself. Fortunately we have in our own state both a *judicial* and *legislative* sanction of the soundness of this principle of

construction in its application to several distinct and important classes of corporations.

In the case of *The People* v. *Morris*, 13 *Wendell*, 325, the supreme court decided, after argument and much deliberation, that this restrictive clause does not apply to public or municipal corporations, such as cities, villages, towns, counties, &c., but that such corporations may be created by a simple majority vote, notwithstanding that clause. This decision receives much additional weight and authority from the circumstance that Chief Justice Nelson, who delivered the opinion of the court in that case, had himself been a member of the convention which framed the new constitution; and had therefore good means of knowing the true spirit, intent and application of the clause in question. We thus see that it has been solemnly adjudged by our own supreme court, that an important class of corporations, even if within the letter, are not within the spirit and intent, and *there- [ *187 ] fore *not within the restriction of the constitution.

We have also a legislative sanction of this principle of construction in relation to several other important classes of corporations. It has been before remarked, that at the time of the framing and adoption of the present constitution of the state, we had in existence and operation five several acts upon different subjects, each authorizing the creation of an indefinite number of corporations, viz : 1. " An act to incorporate such persons as may associate for the purpose of procuring and erecting public libraries in this state." 2. " An act relative to the University." 3. " An act to provide for the incorporation of religious societies." 4. " An act to incorporate medical societies," 5. " An act relative to incorporations for manufacturing purposes." And at the last revision of our laws, these several acts were revised, materially modified, passed by the legislature by a simple majority vote, approved and signed by the governor. Here then is a legislative expression of opinion that these five important classes of corporations, like that of public or municipal corporations, even if within the strict letter, are not within the spirit, and of course, not within the restrictive clause of the constitution. This legislative sanction of this principle of construction is also fortified by the opinion of the revisers. I need not here, for the purpose of adding to the weight of this authority, pronounce the eulogy of these gentlemen, distinguished alike for that general intelligence, great legal learning, and high moral character, which led to their selection for the important duties devolved upon them.

We have thus the authority of the supreme court, the legislature, governor, and revisers, that an act, authorizing an indefinite number of corporations, even if within the letter, may yet not be within the spirit, intent and operation of the restrictive clause of the constitution, but constitute an exception to its general provisions. The question then arises, is the General Banking Law such an act ? If I have been correct in pointing out the *real evil*, for which *this clause of the constitution was intended as a [ *188 ]

*remedy*, and also the principle of construction stated, " that whatever is not within the *evil*, is not within its *remedy*," let us then inquire whether the General Banking Law be within the *evil* complained of, and intended to be remedied ? That *evil* we have supposed to be, not so much the creation of corporations generally, as the character of *exclusive monopoly* of bank charters under the restraining law, and their undue multiplication. Does the General Banking Law come within this *evil ?* Does it come in aid of this great monopoly in banking ? Does it take a right common to all and grant it exclusively to a few ? On the contrary, by repealing, *pro tanto*, the restraining law, it breaks up this great monopoly, and restores to the citizens generally that common right, of which they had been long and wrongfully deprived. Instead, therefore, of increasing *this great evil of monopoly*, it actually comes in aid of its *remedy ;* and, both in its principle and operation, contributes to the attainment of the great object of the constitution itself. We therefore come to the conclusion, that the General Banking Law is not within the *evil*, and consequently not within the *remedy* of the constitutional restriction : It follows that this law, even if it authorize the creation of an indefinite number of corporations, is valid ; and was constitutionally passed, although it may not have received the assent of two thirds of the members elected to each branch of the legislature.

III. But even if this law does come within the provisions of the 9th section of the 7th article of the constitution, it might still have been passed by a vote of two thirds of the members elected to each branch of the legislature.

In this proposition, even a majority of the court below agree. Previous to the adoption of the present constitution, the legislature possessed and exercised the power of passing such laws. The object of the restrictive clause of the constitution, even if applicable to this branch of legislation, was not to prohibit altogether the exercise of this power, or prevent entirely the passage of such acts ; but merely to change the vote by which such acts should be passed. The power of the legislature to pass such acts remains the same *as before ; the manner only of doing it, is modified by   [ *189 ] this new provision of the constitution ; it requiring now for their passage, instead of the vote of a simple majority of a quorum, the assent of two thirds of the members elected to each branch of the legislature.

IV. On the argument of these cases it was made a point on the part of the defendants in error, that even " if any part of the General Banking Law be repugnant to the constitution, it is only void so far as corporate powers are conferred ; every other part remains valid."

That a law may be good and valid in part, and bad and void in part, is undoubtedly true ; but that principle, I think, cannot be applied in the present cases. On what ground is it supposed that the law in question may be in part repugnant to the constitution, and therefore void ? Why, because it may have conferred corporate powers. But what is the requirement of the clause in question of the constitution ? That the assent of two-thirds of

the members elected to each branch of the legislature shall be requisite to every bill creating, continuing, altering or renewing any body politic or corporate. This prohibition of the constitution is against the *creation of a corporation* by a simple majority vote, and not against *the conferring of corporate powers* by such vote. Neither in this clause of the constitution, nor elsewhere, is this latter prohibited. The two cases are entirely different, unless, indeed, we suppose that the conferring of a single corporate power would be the creation of a corporation, by necessary implication. This, I believe, has been no where pretended, but the contrary fully shown, and is often practised. I am of opinion therefore, that the principle embraced in this point, although sound as a general one, is not applicable in the cases now before the court.

Upon the whole view of this subject, I come to the conclusions:

1. That *the associations* authorized and legally formed under the act, entitled "An act to authorize the business of banking," passed April 18 1838, are *not corporations*, within the true intent of the constitution:

2. But if *corporations*, still that the said act, even if within *the letter, does not come within the spirit and intent of the 9th  [* 190 ] section of the 7th article of the constitution; and therefore, that the act was constitutionally passed, although in its passage it may not have received the assent of two-thirds of the members elected to each branch of the legislature:

3. But, if the said act be within the spirit and intent of the restrictive clause of the constitution, still that the legislature might constitutionally pass the same, by the assent of two-thirds of the members elected to each branch thereof.

Therefore, the law being valid, and the declarations in these two cases having sufficiently set forth the plaintiffs' right of action, in the manner specially prescribed in that law, the judgment of the court below was right, and should be *affirmed*.

On the question being put, *Shall these judgments be reversed?* all the members of the court, with but a single exception, (*twenty three* being present,) voted in the *negative*. Whereupon the judgments of the supreme court were AFFIRMED. The court thereupon adopted the following resolutions:

1. "Resolved, That the law entitled 'An act to authorize the business "of banking,' passed 18th April, 1838, is valid, and was constitutionally "enacted, although it may not have received the assent of two-thirds of the "members elected to each branch of the legislature." This resolution was adopted by a vote of 23 to 1.

2. "Resolved, That the associations organized in conformity with the "provisions of the act entitled 'An act' to authorize the business of bank-"ing,' passed April 1st, 1838, are *not* bodies politic or corporate, within "the spirit and meaning of the constitution." This resolution was adopted by a vote of 22 to 3.